## Kincaid's Appeal.

1. A preliminary injunction should not be awarded on a bill sworn to, unless there be injunction affidavits.

2. Ground was conveyed to a congregation, which they appropriated for burial; the congregation increased and was divided into three, the ground was conveyed to them as equal tenants in common, burial lots were sold to individuals and burials made.　An act authorized the vacation and sale of the ground by commissioners, the removal of the bodies to other lots to be purchased with the proceeds, and after payment of expenses, the payment of the balance to the lot-holders according to their rights to be ascertained by arbitrators to be appointed by the Quarter Sessions.　The congregations should be parties to a bill by the lot-holders to restrain the commissioners from carrying out the Act of Assembly.

3. The Act of Assembly is constitutional.

4. The certificate to purchasers of lots "in the burying-ground of the church" was "to have and to hold the said lots for the use and purpose, and subject to the conditions and regulations mentioned in the deed of trust to the trustees of said church."　This was not evidence of a grant of any interest in the soil.

5. The certificate was the grant of a license or privilege to make interments in the lots described, exclusively of others, so long as the ground should remain the "burying-ground of the church."

6. Whenever by lawful authority the ground should cease to be a burying-ground, the lot-holder's right and property ceased.

7. When it became necessary to vacate the ground for burial, all the lot-holder could claim, was to have notice and an opportunity of removing the bodies and monuments; on his failure to do so they could be removed by others.

8. The lot-holder accepted the grant on this condition.

[Kincaid's Appeal.]

9. The grant of a pew in perpetuity does not.give an absolute right as the grant of land in fee.

10. The pew-owner takes only an usufructuary right.

11. If the building be destroyed by casualty the pew-owner's right is gone.

12. If the church has to be rebuilt on the same or a different location the pew-owner has no claim.

13. The disinterment of a body is a misdemeanor at common law.

14. The power of disinterment is a police power and can be delegated by the legislature to municipalities.

15. Every right from an absolute ownership to an easement is held subject to the restriction that it shall so be exercised as to injure others.

16. Every purchaser is bound to know that, although at the time of his purchase the exercise of his right may be inoffensive, it may become otherwise by residence of many others in the vicinity and must yield to laws for suppressing nuisances.

17. The owner of a burial lot in which no interment has been made, loses the use of his lot by a law prohibiting interments there, and is not entitled to compensation.

18. In such case his property has not been taken for public use.

19. The state has the right to regulate the use of all° property for the public good.

20. Where one covenants not to do a lawful thing and the legislature afterwards compels him to do it, the law repeals the covenant.

November 7th 1870.   Before Thompson, C. J., Read, Agnew, Sharswood and Williams, JJ.

Appeal from the decree of the District Court of *Allegheny county :* In Equity: No. 152, to October and November Term 1869.

This was a bill filed October 1st 1868, by David Boyd and seventy-three other persons against Philip R. Kincaid, Richard Parker and William Vankirk.

The bill set out that the Methodist Episcopal Church of Pittsburg, incorporated in January 1834, purchased from John Keating, a lot on the plan of lots on Grant's Hill, now in the 11th ward, Pittsburg, for a graveyard; that the church laid out the ground in walks, paths, and burial lots, numbering and marking the lots for sale, except a portion reserved for strangers; the lots were sold; the ground had been used for a cemetery since 1834 and ornamented by the lot-holders at a cost of many thousand dollars; that the plaintiffs had bought or inherited lots in the cemetery; that there was still room in some of the lots for burial.

The following was a certificate for a lot to one of the plaintiffs, the same form being always used :—

"Pittsburg, April 18th 1835.   This is to certify that David Boyd, a subscriber, in consideration of the sum of $10, by him paid to the trustees of the Methodist Episcopal Church of the city of Pittsburg, the receipt whereof is hereby acknowledged, is entitled to two burying-lots in the burying-ground of said church, 8 feet wide by 16 feet long, and numbered in the plan of the same Nos. 31 and 32.   To have and to hold the said lots for the use and purpose, and subject to the conditions and regulations men-

tioned in the deed of trust to the trustees of said church, in testimony whereof I hereby affix the seal of said church."

That the defendants, claiming to act under an Act of Assembly, in March, April and May 1868, without the consent of the plaintiffs and against their protest, dug up the greater part of the bodies in the stranger's portion, and some in the lots, destroyed the shrubbery, monuments, &c., and were proceeding to take up the remainder, when they were stopped by the Board of Health, and that they threatened to continue, &c. The plaintiffs averred, that they, with other lotholders, are owners of nearly all the cemetery, having bought or inherited the same, and that whatever title the corporation held was for their use; that the Act of Assembly was unconstitutional. The bill further alleged that the defendants did not act according to the Act of Assembly; that they committed outrages in the removal, &c.

The prayer was that the defendants might be perpetually enjoined from digging up and removing the dead, &c., and for general relief.

The bill was sworn to by three of the plaintiffs.

The defendants answered that they had removed a number of bodies, and purposed to remove the remainder, acting in so doing under two Acts of Assembly, copies of which they appended to their answer; that they had in all things endeavored in good faith to carry out the provisions of the acts, and had tried to meet the wishes of the friends of the deceased, by removing the bodies to such cemeteries as they designated; that they made an agreement with another cemetery to furnish suitable ground and inter some of the bodies; they denied outraging or otherwise improperly acting with the cemetery; that for several years the ground had been abandoned as a burial-place, the churches having charge of it being without income for the purpose, not keeping it in order but suffering the fences to go down; that it was advertised to be sold for municipal claims and would have been sold had not the defendants paid them; that it was exposed to daily intrusion and desecration; that its vacation as a burial-ground and sale for other uses was a matter of necessity, and the Act of Assembly was constitutional and proper. The answer averred, the neglect of the lots by the friends of those buried there; that the defendants had made many efforts to arrange the compensation with those interested; they had made reasonable offers but were met with unreasonable demands; that the city where the ground lies had been improving greatly; that part of the ground had been taken for a street, &c., &c.

There were no injunction affidavits.

The first Act of Assembly was passed April 13th 1867.

It recited the purchase of the ground for a burial-ground for the church; that at the time of the purchase all the mem-

bers of the church in Pittsburg belonged to one congregation, which had so increased that they had been organized into three congregations, the Liberty Street, the Smithfield Street and Wesley Chapel, each having its own charter and a separate board of trustees; that by direction of a corporation meeting on the 7th of June 1849 the burial-ground was conveyed to the three congregations to be held by them as equal tenants in common; and that the interest of Wesley Chapel had since been transferred to the Centenary Board of the Pittsburg Conference of the Methodist Episcopal Church; that by the growth of the city, and the opening of incorporated cemeteries, the ground had ceased to be used for interments, many bodies had already been removed and it was necessary to remove the remainder, and to vacate the ground for burial purposes, &c.

The 1st section forbade interments in the ground.

The 2d directed the commissioners appointed by the act to purchase suitable lots in incorporated cemeteries and remove all remaining bodies and have them decently interred, and set up at the new graves the gravestones standing in the burial-ground, notice to be given of the intended removal.

The 3d authorized the commissioners, after the removal of the bodies, to sell the burial-ground, and declared that the purchasers should be vested with " a perfect and indefeasible fee-simple title, free and clear from all claims or interests of the same corporations and of all owners of lots in said burial-ground."

The 4th directed that the proceeds of sale should be appropriated, 1. to paying for the new lots and the expenses of removal: 2. compensation to lot-owners in the old ground: 3. The residue, after defraying other necessary expenses, should be distributed equally between the Liberty Street and the Smithfield Street congregations and the Centenary Board.

The 5th provided that if the commissioners could not agree with lot-owners, the commissioners might apply to the Court of Quarter Sessions of Allegheny county, who should appoint arbitrators to examine the claims and report what should be paid to the lot-owners; their report, when approved by the court, should be final.

The 6th appointed Edward Heazleton of the Centenary Board, and the defendants, Philip R. Kincaid of Liberty Street congretion and Richard Parker of the Smithfield Street congregation, commissioners. Heazleton having declined to act, William Vankirk, the other defendant, was appointed in his place by Act of February 14th 1868.

The case was heard before Hampton, P. J., who, in his opinion, after stating the allegations, &c., in the bill and answer, and the Act of Assembly, said:—

* * * " Here we have the naked question presented whether or

not this act of the legislature is constitutional? If it is, then the injunction to restrain the defendants from proceeding in a proper manner, under the act, must be refused, but if it is not, then it must be awarded.

"By the 4th section of the constitution it is provided that 'the legislature shall not invest any corporate body or individual with the privilege of taking private property for public use, without requiring such corporation or individual to make compensation to the owners of said property, or give adequate security therefor before such property shall be taken.'

"Under this article it has been held by the Supreme Court that it is not necessary that the compensation to the owners should be actually ascertained and paid before the property is appropriated; but it is sufficient if an adequate remedy be provided by which he can obtain compensation, without any unreasonable delay.

"The latter clause of the 10th section of the 9th article declares, 'Nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being made.' And by the 9th section of this article it is declared that a person cannot 'be deprived of his life, liberty or property unless by the judgment of his peers or the law of the land.'

"The words 'taken' and 'deprived,' in these two sections, have been construed by the Supreme Court to mean one and the same thing. In Sharpless v. The Mayor of Philadelphia, 9 Harris 166, Black, C. J., says, 'the word 'take' is one of the commonest and plainest in the language, and cannot easily be misunderstood by a lawyer or layman. As used in the constitution, it has universally, in this state and elsewhere, been interpreted to mean a taking altogether, a seizure, a direct appropriation, dispossession of the owner.' In the same opinion he says, 'the word 'deprived' in this section (sec. 9, art. 9) has received the same construction as the word 'taken' in section 10, and for reasons equally clear and strong.'

"Have these plaintiffs such a 'property' in their lots as is contemplated by the constitution? They purchased and paid for them a great many years ago, took possession, ornamented and improved them, and have had the exclusive and continued possession ever since. Nor is this all. The president of the corporation, from which they purchased, under the seal of said corporation, gave each of them the certificate hereinbefore copied.

"It is not necessary that they should have a fee simple or any estate of a fixed and determinate period; nor is it necessary that the 'property' mentioned should be in land. It is enough if it be recognised as 'property' by the laws. Under the facts in this

case, therefore, it cannot be alleged that they had not such property as would entitle them to protection.

"Nor can it well be denied that, if the provisions of this Act of Assembly are carried out, they will be 'deprived' of that property.

"The next question in order to be considered is—whether this Act of Assembly makes adequate provision for compensation to these lot-holders? The 5th section contains the only provision on the subject. * * *

"These commissioners are not required to give bail, nor are they directed, in case of disagreement with the lot-holders, to apply to the court for viewers or arbitrators, before the property is sold, deeds made and money received; nor is there any authority given to the lot-holders at any time, before or after their property is sold, to apply to the court for viewers; nor does it seem to be obligatory on the commissioners to apply. It says they 'may,' but even if that word 'may' were construed to mean 'must,' it need not be done until after the purchasers are invested with a title in fee simple, clear of all claims of the lot-holders. Then the right of appeal is not allowed on the question of the value of these lots. Then, again, suppose the property should not sell for enough, after paying the expenses of removing the dead and purchasing burial-grounds elsewhere, to pay the lot-holders the value awarded to them by the arbitrators, there is no provision for paying the deficiency. The loss must be borne by them, without any means of redress.

"These are a few of the reasons, but in my opinion, amply sufficient to show that adequate provision is not made for compensation to the owners of these lots; and for that reason, if for no other, this act of the legislature must be held to be unconstitutional and void.

"The only remaining question is—whether this property was taken for public use?

"The only reason assigned by the legislature for the passage of the act is contained in the following clause of the preamble, viz. :—

"'And whereas, by the growth of said city, and the opening of several incorporated cemeteries in the vicinity of said city, the said burial-ground has ceased to be used for interments, many of the bodies have already been removed, and it has become proper and necessary' to remove the remaining ones, to vacate the said ground for burial purposes, and to have the same sold and appropriated to other purposes.'

"These are the only reasons given. It is not alleged that this burial-ground is in any way injurious to the health of the city, but that persons have ceased to bury there, and that, forsooth, is

assigned as a reason for digging up and removing the bones of those who have been interred there. Is the rule to be established in this country that, whenever a graveyard has become full, the remains of the dead must all be removed and the ground sold out for building lots?

"But it is alleged by these defendants that it stands in the way of the growth and progress of the city, and therefore it must be sold out for building lots. What interest has the public in this matter? Whether this sacred depository of the dead shall be permitted to remain as it was, or whether it is to be sold out in lots and covered with dwelling-houses, is certainly a matter of very little moment to the community. If it is to be the settled practice of the state to remove the dead and sell out the cemeteries for private uses, whenever a town or city extends to and beyond the grounds, how long will it be before a similar act, for the same reasons, will be asked for, to sell the Allegheny or any other cemetery, now within the limits of the consolidated city? Much stronger reasons could be urged for the sale of the Allegheny Cemetery than for this. It is much larger—embracing nearly 200 acres—with beautiful building sites nearly all over it. It presents a much more formidable obstruction to the growth and extension of the city in that direction; and then it would yield a much larger sum of money by selling it out in building lots, to go into the pockets of the corporators.

"But it is urged, as a reason for the passage of this act, by the defendants in their answer, that the city of Pittsburg had claims amounting to over $3000 for street improvements, with no means of payment, and that it was about to be sold by the sheriff, when the defendants advanced the money and paid off the debt.

"Another reason is assigned, that the city intend to open a street through this ground.

"Whether the city councils have or have not authority to do these things, I will not say, for it is unnecessary to decide this question at present. But on the 5th of April 1849 the legislature passed the following act, viz. :—

"'Hereafter it shall not be lawful to open any street, lane, alley or public road through any burial-ground or cemetery, within this Commonwealth, any laws heretofore passed to the contrary notwithstanding.'

"Under this act it has been held that a subsequent statute appointing commissioners to survey and lay out such streets within the limits of a borough, as they shall deem necessary, does not empower them to locate a street over any part of a burial-ground.

"By another Act of the 5th of April 1859 it is provided that 'whenever any lot or lots, or the right of sepulture therein, shall be granted to any person or family, by any incorporated cemetery company, or church or religious congregation, within any common

16 P. F. SMITH—27

[Kincaid's Appeal.]

enclosure made by such company, church or congregation, as used for the purpose of the perpetual burial of the dead, every and all lots so disposed of or used for burial shall hereafter be free and exempt from all taxation, so long as the same shall be used or held only for the purpose of sepulture.'

" Whether the city fathers have obtained any recent legislation on this subject, giving them the power to tax this burial-ground to improve the streets, or to lay out streets through it, I know not, nor is it necessary at present to decide.

" After the most careful and thorough investigation of this case, I have failed to discover the slightest interest the public have in the removal of these remains, and the sale and conversion of the property to private purposes.

" For these reasons I am clearly of the opinion that the Act of Assembly under which the defendants claim their authority, is unconstitutional, null and void.

" Let a preliminary injunction issue, as prayed for, upon the presentation and approval of the proper bond."

The defendants appealed to the Supreme Court, and assigned the decree of the District Court for error.

*J. F. White* and *J. J. Kerr*, for appellants.—The act must be clearly unconstitutional, and allow that which is prohibited by the constitution, the assumption of a power not legislative, or it will be valid: Sharpless v. Mayor, 9 Harris 161; Commonwealth v. Hartman, 5 Id. 119; Commonwealth v. Maxwell, 3 Casey 444; Harney v. Thomas, 10 Watts 63; Commonwealth v. McWilliams, 1 Jones 70. The legislature may prohibit burying in ground covenanted to be for that use: Coates v. Mayor of New York, 7 Cowen 585. They may vacate burial-grounds if public necessity require: Pittsburg v. Scott, 1 Barr 320. The lot-holders had not a right in the land; it is like a pew-right, which will not prevent the sale of the church: Chambers v. Wells, 12 Harris 249; Richards v. N. Western Church, 32 Barb. 42; Price v. M. E. Church, 4 Ham. 515. Private acts authorizing the sale of real estate when the title is defective, or where various interests are involved, are valid: Pittsburg v. Scott, *supra;* Norris v. Clymer, 2 Barr 284; Fullerton v. McArthur, 1 Grant 232; Custer v. Commonwealth, 1 Casey 375; Mott v. Penna. Railroad, 6 Id. 9; Kneass's Appeal, 7 Id. 87; Greenawalt's Appeal, 1 Wright 95.

*R. Woods*, for appellee.

The opinion of the court was delivered, January 3d 1871, by
SHARSWOOD, J.—This is an appeal from a decree awarding a preliminary injunction. The motion in the court below was upon

a bill filed and sworn to, but without any injunction affidavit or affidavits. This is a practice which ought not to be countenanced. The defendant, however, did not take any objection on this account, but put in an answer under oath. Neither bill nor answer is as full as it ought to be; but we may gather from them enough to enable us to decide this appeal.

It appears that in 1834 "The Methodist Episcopal Church in the City of Pittsburg" purchased a piece of ground for the purpose of a grave-yard, and that it was so dedicated and used. The church was afterwards divided into three separate stations or congregations, and the trustees of the original society conveyed the said lot in 1849 to them as tenants in common. The interest of one of the said congregations has since been assigned and transferred to the Centenary Board of the Pittsburg Conference of the Methodist Episcopal Church. It is not a matter of contention, but that subject to whatever rights individuals may have acquired in the graves and burial-lots, the title, legal or equitable, is in these parties. It also appears that in process of time the ground ceased to be used any longer for interments, and many of the bodies had been removed to other cemeteries. The city was growing and becoming closely built around it, and as no income was derived from it by the churches, there were no means of keeping it in proper order, and from its neglected condition it was rapidly becoming a nuisance to the neighborhood. In this state of affairs the legislature passed an Act April 13th 1867, Pamph. L. 1234, entitled "An Act for the vacation and sale of the Methodist burial-ground in the city of Pittsburg, and for removing the bodies therefrom." After reciting the facts, it provided "that from and after the passage of this act it shall be unlawful to make interments in the said burial-ground; and after the removal of the bodies therein, as provided for in this act, the same shall be vacated for burial purposes." It proceeds to declare that the commissioners to be named in the act should be authorized to purchase one or more suitable lots in some of the cemeteries in the vicinity of the city, and remove thereto all the remaining bodies in the said burial-ground, and have them decently interred; and they shall also remove and set up over the new graves the monuments and tombstones now standing in the said burial-ground over the present graves, with a proviso for the publication of an advertisement of their intention to do so. After the removal, the commissioners are to sell the ground in such manner as they shall deem most advisable and most likely to realize the most money; and the proceeds are to be distributed by them, 1st. To pay the expenses of removal, including the cost of the new lots. 2d. To compensate the lot-holders; and 3d. The balance, after defraying other necessary or incidental expenses, to be divided between the congregations entitled and

the Centenary Board. The commissioners are authorized to compromise and settle with the lot-owners, either before or after the removal of the bodies, and if they cannot agree they may apply to the Court of Quarter Sessions, who shall appoint three disinterested persons as arbitrators to determine how much, if anything, shall be paid to each lot-owner, and their award, when approved by said court, shall be final and conclusive. The defendants are the commissioners appointed by this act and a supplement thereto, passed February 14th 1868, Pamph. L. 167. The congregations interested ultimately, have not been made parties, as it would seem that they ought to have been, but we may assume that the Act of Assembly was passed at their instance. The allegations of the bill, that the defendants are carrying out the act in an improper manner, and not in accordance with its directions, are denied in the answers. So that the only question is, whether as to these complainants the act is constitutional so far as it directs the removal of the bodies and of the tombstones and monuments to some other cemeteries. The learned president of the District Court was of the opinion that this was an unconstitutional infringement upon their rights, and therefore awarded the injunction.

The plaintiffs may be divided into two classes; holders of certificates and holders of interment permits. The certificate set out in the bill states that the subscriber, in consideration of $10 paid by him, is entitled to " two burying lots in the burying-ground of said church;" " to have and to hold the said lots for the use and purpose and subject to the conditions and regulations mentioned in the deed of trust to the trustees of said church." This deed of trust is not produced or annexed to the bill. We have printed in the appendix of the paper-book of the appellants the deed of Keating and wife to the Methodist Episcopal Church of the city of Pittsburg; but in this deed no trustees are named. It is a direct grant to the church; expresses no trust—not even the object for which the ground was conveyed. The appellants admit, however, in their paper-book that the deed to the trustees contains no conditions or regulations on the subject. We will assume this to be so. We cannot, however, consider the certificate as evidence of a grant to the lot-holders of any interest or title in the soil; and if this is so of course not the interment permits. Had it been so intended it would surely have contained words of inheritance. Taking it for a grant it is only for the life of the lot-holder, and at the very time it would be needed for his own interment his title would cease. Without any accompanying conditions and regulations it is a very loose paper. We hold that it was the grant of a mere license or privilege to make interments in the lots described, exclusively of others, as long as the ground should remain " the burying-ground of the church." Whenever by law-

ful authority it should cease to be a burying-ground his right and property would cease. The lot-holder purchased a license— nothing more—irrevocable as long as the place continued a burying-ground—but giving no title to the soil. Whether it was an incorporeal hereditament descendible to him, or passed on his death to his personal representatives, it is unnecessary to decide. While the license continued he could, perhaps, bring trespass or case for any invasion or disturbance of it, whether by the grantors or by strangers. But if in the course of time it should become necessary to vacate the ground as a burying-ground, all that he could claim, either in law or equity, would be that he should have due notice and the opportunity afforded to him of removing the bodies and monuments to some other place of his own selection, or that on his failing to do so such removal should be made by others. He accepted the grant or license subject to this necessary condition. We are not without decisions in our sister states in support of this view. In Windt v. The German Reformed Church, 4 Sandf. Ch. Rep. 471, it was held that the sepulture of friends and relations in a cemetery belonging to a religious society, confers no right or title upon the survivors, and they cannot prevent the sale of such cemetery by the corporation and the removal of the interred remains, when such removal is in other respects conducted according to law; and in that case the Vice-Chancellor remarked: " the only protection afforded to the remains of the dead interred in a cemetery of this description, is by the public laws prohibiting their removal, except on the prescribed terms, and in a still stronger public opinion. Probably these furnish all the protection which is consistent with the exigencies of a large city, the population of which increases with marvellous rapidity, and whose wants leave but little room for the remains of the dead in the dense and crowded haunts and thoroughfares of the living." He adds, speaking of such a grant or permit: "It confers the privilege of sepulture for such body in the mode used and permitted by the corporation, and the right to have the same remain undisturbed so long as the cemetery shall continue to be used as such, and so long also, if its use continues, as such remains shall require for entire decomposition; and also the right in case the cemetery shall be sold for secular purposes to have such remains removed and properly deposited in a new place of sepulture." In Richards v. The North-West Protestant Dutch Church, 32 Barb. 42, it was held that the sale of a church vault gave the right of interment in that particular plat of ground so long as that and the contiguous ground continued to be occupied as a church-yard. Every person purchases such privilege with the full knowledge and implied understanding that change of circumstances may in time require a change of location. He cannot, therefore, have an injunction to prevent the disposition of the soil and the removal of the remains.

See also Price *v.* The Methodist Episcopal Church, 4 Ham. 515. The grant of a pew in a church edifice creates a kind of right which appears to be in all respects analogous to that of a burial lot in a grave-yard. In regard to pews there have been many more determinations than in regard to burial lots, and the voice of the authorities is uniform and clear. The grant of a pew in a church edifice in perpetuity does not give to the pew-owner an absolute right of property as in a grant of land in fee. He has a limited usufructuary right only. He must be presumed, from the very nature of the subject-matter, to have taken the grant under all the conditions and limitations incident to such property. If the edifice becomes useless by dilapidation, or is destroyed by fire or any other casualty, the right of the pewowner is gone. So if from age, decay or other injury the house has to be rebuilt in the same place, or from some necessary cause the location must be changed, the old edifice sold and a new one erected on another spot, the pewholder has no claim either in law or equity. It is said, indeed, in some of the cases that if the congregation or parish, from mere motives of convenience or ornament, resolve to pull down the old and erect a new church edifice, in such case the pewowner is entitled to compensation; that is, the parish or church from whom the grant is derived must not wantonly deprive their grantee of the benefit of the license or privilege without making to him compensation. But where it is an act of necessity, required by the condition of the building or other imperative exigency, he has no claim whatever to compensation: Gay *v.* Baker, 17 Mass. 435; Daniel *v.* Wood, 1 Pick. 102; Wentworth *v.* First Parish in Canton, 3 Id. 344; Howard *v.* First Parish in North Bridgewater, 7 Id. 137; Fassett *v.* First Parish in Boylstown, 19 Id. 361; Freligh *v.* Platt, 5 Cow. 494; Voorhees *v.* Presbyterian Church of Amsterdam, 8 Barb. 135; s. c. 17 Id. 103; Reformed Church in Saugerties, 16 Id. 237; Cooper *v.* The First Presbyterian Church of Sandy Hill, 32 Id. 222; Brick Presbyterian Church, 3 Edwards Ch. 133; Baptist Church in Hartford *v.* Witherell, 3 Paige 296; Kellogg *v.* Dickinson, 18 Vt. 266; Penia *v.* Grange, 33 Vt. 101. I do not pretend that this citation exhausts the cases on the subject, but they are the leading ones. This court has followed this train of decisions in Church *v.* Wells's Ex'rs, 12 Harris 249, in which Lowrie, J., said, " a pew right is not of such a character as to prevent an absolute sale of the church edifice, either by contract or judicial process; by itself it was never known as a subject of taxation; if the edifice burns down the pew right is gone; it does not prevent the society from tearing down and rebuilding the edifice or from altering the whole interior arrangement of it; it does not authorize the pewholder to change and decorate the pew according to his fancy, or to cut it down and

carry it away; and it gives him no right to the ground on which it stands.   It is, therefore, a right that is entirely peculiar."

Such being the restricted and qualified character of the rights of the plaintiffs, whether as holders of certificates or permits, it remains to inquire whether the ground in question had by lawful authority ceased to be a burying-ground; and the removal of the remains of the bodies, with the monuments, to another place or places in like manner authorized.   The disinterment of a dead body is a misdemeanor, and indictable at common law as an offence "highly indecent and *contra bonos mores*:" King *v.* Lynn, 2 Term Rep. 733; Commonwealth *v.* Cooley, 10 Pick. 37; Kanavanis' Case, 1 Greenl. 226.   We cannot doubt that it is competent for the legislature to authorize or to delegate that power to the municipalities.   It is a police power necessary to the public health and comfort.   As they can authorize the removal of any other thing which they may deem a nuisance, by a summary proceeding, without a jury trial, so they can authorize and direct the removal of dead bodies from any ground, and the consequent vacation of it as a burying-ground.   No one can doubt the power of the legislature to prohibit all future interments within the limits of towns or cities.   In ancient times, in Greece and Rome, such was the universal rule.   It was one of the laws of the twelve tables " *hominem mortuum in urbe ne sepelite neve vicinitate.*"   It is much to be regretted that it was not adopted as our policy at an early period.   This is no invasion of any right of property.   Every right, from an absolute ownership down to a mere easement, is purchased and held subject to the restriction that it shall be so exercised as not to injure others.   Though at the time it may be remote and inoffensive, the purchaser is bound to know at his peril that it may become otherwise, by the residence of many people in its vicinity, and that it must yield to laws for the suppression of nuisances.   If conditions or covenants, appropriating land to some particular use, could prevent the legislature from afterwards declaring that use unlawful, legislative powers necessary to the comfort and preservation of populous communities might be frittered away into perfect insignificance.   If a man were to purchase a building upon condition that it should only be used for the storing of gunpowder—though perfectly lawful at the time—if the legislature made it unlawful, his property would become valueless; yet it would hardly be pretended that he would have any right to compensation as for property taken for public use.   So the holder of a burial lot, in which as yet no interments have been made, who has purchased and paid for it under the restriction that it shall be used for no other purpose, by the passage of a law making such interments unlawful, loses all use of the lot.   Yet he has no claim for compensation, for it cannot be said in any sense that his property has been taken for public use.

The state has the unquestionable right to regulate the use of all property for the public good. Therefore a statute authorizing the harbor master of New York to regulate and station vessels in the East and North rivers was held to extend to the wharves of private owners, and that it was not unconstitutional as interfering with private property : Vanderbilt *v.* Adams, 7 Cowen 349. Where the corporation of the city of New York had conveyed to a religious society a piece of ground for burial purposes, with a covenant for quiet enjoyment, and afterwards, in pursuance of authority vested in them, prohibited all future interments, it was held that the covenant no longer existed. When one covenants not to do a thing which it is lawful for him to do, and an act of the legislature comes afterwards and compels him to do it, the act repeals the covenant : Brick Presbyterian Church *v.* The Mayor, &c., of New York, 5 Cowen 578. It has, accordingly, been always maintained, that such laws and ordinances, as applicable to existing burial-grounds, are constitutional and valid : Coates *v.* The Mayor, &c., of New York, 7 Cowen 585; City Council of Charlestown *v.* The Wentworth First Baptist Church, 4 Strob. Law Rep. 306. If upon the principles thus stated, the constitutionality of this exercise of legislative power is unquestionable, ought it to be doubted for a moment that they can proceed a step further and declare a burying-ground to be vacated as such, and authorize and direct the removal of the bodies therefrom ? As to those recently interred, the necessity with a view to public health and comfort of removing them, is as apparent as the prohibition of future interments. With those which have become entirely decomposed, leaving only the bones, that necessity may not be so urgent, but of that the legislature are the exclusive judges. They may direct the removal in such manner and upon such terms as to them may seem wisest and best—having due regard to that feeling of reverence and attachment which all men naturally have to the spot where the ashes of their departed ancestors and friends repose, and the strong desire that, if possible, they should not be disturbed. Even these feelings, however, must yield to the higher consideration of the public good.

We have come, then, to the conclusion that the Act of Assembly of April 13th 1867 was constitutional and valid, and that the preliminary injunction below ought not to have been awarded.

Decree reversed, and record remitted for further proceedings.