CARPENTER v. BOROUGH OF YEADON et al.

(Circuit Court, E. D. Pennsylvania. March 4, 1907.)

(No. 23.)

1. MUNICIPAL CORPORATIONS—VALIDITY OF ORDINANCE.
   Where the Legislature has conferred upon a municipal corporation in express terms the power to do a specific thing, an ordinance passed pursuant thereto cannot be impeached in the courts, because it would have been unreasonable if passed in the exercise of a general or incidental power, there being no question of fraud or oppression raised.

2. SAME—POWER TO REGULATE CEMETERIES—PENNSYLVANIA BOROUGH ACT.
   The power conferred on boroughs by the Pennsylvania borough act of 1851 (P. L. 322. § 2, cls. 16, 17) "to prohibit within the borough the burial or interment of deceased persons, or within such partial limits within the same as they may from time to time prescribe," and "to make such other regulations as may be necessary for the health and cleanliness of the borough," may properly be exercised by the passage of an ordinance by the borough council, and such an ordinance prohibiting the establishment of any new cemetery within the borough or any burials except within the limits of existing cemeteries is within such power and valid.

3. CEMETERIES—LANDS CONSTITUTING CEMETERY.
   Certain persons obtained an option for the purchase of a tract of land of 90 acres. Three acres were to be purchased separately and the remainder by a later date stated. The three acres were purchased and

paid for and devoted to cemetery purposes, the bodies from an existing cemetery being moved and reburied thereon. After this the borough passed an ordinance prohibiting the establishment of any new cemetery therein, or "the enlargement of the existing cemeteries or burying grounds within the borough, by adding thereto or using for the purposes of interment ground not now owned by the owners of such cemeteries or burying grounds." Prior to this the purchasers of the three acres had organized a cemetery association to which such land was afterward transferred, and which still later completed the purchase of the remaining 87 acres largely on credit and by payment in its stock. The greater part of the stock was issued to the promoters, and the association being unable to sell its treasury stock was without funds. The 87 acres was not subdivided into lots nor prepared for cemetery purposes, nor were any burials made therein, and at the end of three or four years the land was sold in foreclosure proceedings to an individual purchaser. *Held*, that such land was not an established cemetery at the time of the ordinance, within the meaning of such ordinance, and that the purchaser was not entitled thereunder to use it for cemetery purposes.

In Equity. On final hearing.

E. Waring Wilson, A Lewis Smith, and John G. Johnson, for complainant.

Isaac E. Johnson, O. B. Dickinson, and Dwight M. Lowrey, for respondent.

J. B. McPHERSON, District Judge. This is a bill in equity brought by the complainant against the borough of Yeadon and certain of its officers to restrain the enforcement of an ordinance passed in July, 1895. The ordinance is as follows:

"Section 1. The councils of the borough of Yeadon do ordain.: The establishment or use for purposes of interment of any new cemetery or burying ground in addition to those now existing within the limits of the borough at any time hereafter is hereby prohibited.

"Sec. 2. The enlargement of the existing cemeteries or burying grounds within the borough, by adding thereto or using for purposes of interment ground not now owned by the owners of such cemeteries or burying grounds respectively is hereby prohibited.

"Sec. 3. The interment of any human body in any place within the borough of Yeadon except in ground now used as a cemetery or burying ground, or without the requirements of the borough board of health having been complied with, is declared to be a nuisance, and is hereby prohibited.

"Sec. 4. Disinterments may only be made between the first day of October and the thirty-first day of May, instead of between the first day of November and first day of May as heretofore provided.

"Sec. 5. All disinterments shall be made during the daylight and superintendents of burial grounds are prohibited from allowing any dead body to be removed from or interred in their respective grounds between sunset and sunrise.

"Sec. 6. Bodies may be disinterred and removed from grave to grave in the same cemetery by permits between June first and October first.

"Sec. 7. In all such cases the remains shall not be exposed to view without special permit from the board of health.

"Sec. 8. All permits for disinterments from vaults or grave shall become void unless used within seventy-two hours after date of issue.

"No interment of any human body shall be made within the limits or within the portion of the limits, of any cemetery, now or hereafter located within the borough of Yeadon, or anywhere else in said borough, until there shall have been filed by the superintendent of the cemetery in which the proposed interment is to take place, if it is to be in a cemetery, or by the person having charge of such interment if it is not to be in any cemetery, with the secre-

tary of the board of health for the time being of the said borough, a certificate of death for each human body proposed to be so interred, giving the full name, age, sex, cause of death, and last residence of the deceased, and signed by the physician attending during the last illness or by a coroner or health officer of this or some other municipality, and a permit for the interment of each such human body issued by the said secretary of the board of health of said borough, the fee for which permit shall be one dollar ($1), and shall be paid to the said secretary of the board of health of said borough (to be by him paid into the borough treasury) by the superintendent of the cemetery in which the interment is to take place, if it is to be in a cemetery, otherwise by the person applying for such permit, before such permit shall be issued. In case the said certificate of death shall show that the deceased has died of any communicable disease, and in case knowledge of that fact shall come to the secretary of the board of health of said borough in any other way, the secretary shall report the same to the board of health before issuing the said permit, whereupon the said board may either prohibit such interment, or direct and enforce such precautions to be taken in making such interment as they shall deem necessary to preserve the public health; provided, however, that in case of the removal of human bodies from one cemetery or other ground, either within or without the said borough, to a cemetery or other place in said borough, the only certificate necessary to be filed shall be the permit, or an attested copy of the permit, issued by the cemetery or municipality from which said body shall be removed, but the permit for the interment of such human body in any cemetery or elsewhere within this borough shall be taken out and the fee therefor shall be paid in every case as above provided in these as in other cases."

The foregoing ordinance was passed in the exercise of the power given by clauses 16 and 17 of section 2 of the general borough act of 1851 (P. L. 1851, 322), under which the borough of Yeadon was incorporated. These sections give to boroughs that are chartered under the act the power,

"16. To prohibit within the borough the burial or interment of deceased persons, or within such partial limits within the same as they may from time to time prescribe, and to regulate the depth of graves.

"17. To make such other regulations as may be necessary for the health and cleanliness of the borough."

The complainant is the owner of two tracts of land, not contiguous, one containing 75 acres and the other containing 12 acres to which he acquired the legal title in 1898 by virtue of a sheriff's sale upon the foreclosure of a mortgage. He desires to use these two tracts for cemetery purposes—claiming to have succeeded to the rights of a corporation called the North Mount Moriah Cemetery Company, of which more will be said hereafter—but the borough refuses to permit him so to do, even upon payment of the fee and compliance with the other regulations prescribed by the ordinance of July, 1895. The complainant has accordingly brought the dispute into court, and attacks the borough's refusal on two grounds:

(1) Because the ordinance is unreasonable and therefore illegal (to quote the language of paragraph 16 of the bill) "inasmuch as it directs that certain grounds may be used for purposes of interment, whilst other grounds may not be used, including those of the complainant."

(2) Because "the terms of said ordinance are not applicable to him, inasmuch as the cemetery in question was established at the time of the passage of the said ordinance."

151 F.—56

These positions will be considered in their order. Since the controversy has to do with the construction of a Pennsylvania statute that affects the use of land in Pennsylvania, it is obvious that a federal court should be controlled by such decisions of the state Supreme Court as may throw light upon the subject, and that decisions in other states on the same general subject are of inferior authority. Before turning to the decisions, however, it should first be observed that the power under which the ordinance in question was passed is an express, and not an implied, power. Clause 16 of section 2 is not of doubtful meaning. It gives boroughs incorporated under the act the power to prohibit interments altogether within the municipal limits, or to permit them within whatever area or areas the council may see proper to designate. That such a power belongs to the state and may be delegated to its municipal agents, such as cities and boroughs, is not open to question. The power of the Legislature to prohibit all future interments within the limits of towns or cities was expressly recognized by the Supreme Court of Pennsylvania in Kincaid's Appeal, 66 Pa. 411, 5 Am. Rep. 377, and in Craig v. Presbyterian Church, 88 Pa. 42, 32 Am. Rep. 417, where the whole subject of burial and removal is elaborately discussed, and the legislative power, either by act of assembly directly regulating the matter or by an act delegating the power of regulation to its municipalities, is unequivocally affirmed.

Assuming, therefore, that the borough of Yeadon was expressly given such power by the act of 1851, the next question is whether the reasonableness of the ordinance by which it exercised the power is open to question in the courts. This question, I think, must be answered generally in the negative. The rule is thus stated in Dillon on Municipal Corporations (4th Ed.) § 328:

"Where the Legislature, in terms, confers upon a municipal corporation the power to pass ordinances of a specified and defined character, if the power thus delegated be not in conflict with the Constitution, an ordinance passed pursuant thereto cannot be impeached as invalid, because it would have been regarded as unreasonable if it had been passed under the incidental power of the corporation, or under a grant of power general in its nature. In other words, what the Legislature distinctly says may be done cannot be set aside by the courts, because they deem it to be unreasonable or against sound policy. But where the power to legislate on a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid."

Doubtless a fraudulent or oppressive exercise, even of a power expressly granted, might be judicially restrained, but there is no evidence here of either fraud or oppression. And, if the complainant is to be understood as declaring the ordinance to be invalid on the ground that the mode of exercising the power was not prescribed by the act of 1851, and that the ordinance of July, 1895, was not a reasonable exercise of the power, I think the answer to his argument is threefold:

First. The act of 1851, while it does not specifically say that the power to prohibit interments shall be exercised by the passage of an ordinance, does say, in the first clause of section 2, that:

"The powers of the corporation shall be vested in the corporate officers designated in the charter. They shall have power:

"1. To make such laws, ordinances, by-laws and regulations, not inconsistent with the laws of this commonwealth, as they shall deem necessary for the good order and government of the borough."

The section then goes on to enumerate in its remaining clauses what powers the borough is to have, and the effect of the whole section, taken together, is to give to the borough express power to pass ordinances on the subject now under discussion.

Second. But, even if it should be held that the act does not prescribe expressly the mode in which the power is to be exercised, I do not see upon what ground it can be successfully maintained that the passage of an ordinance is not a reasonable exercise of the power. Indeed, it could not be otherwise exercised, as it seems to me. Certainly no other way has been pointed out by the complainant's argument. The subject seems to be for the borough council, in the first instance, and not for the administrative officers alone.

Third. But, if the argument is that the mode of exercising the power was unreasonable because the ordinance permitted existing cemeteries to continue to bury the dead, while it prohibited burial in any other part of the borough, this is to be said in reply: The ordinance does no more than clause 16 expressly permits, namely, define partial limits within which interments may take place, and this, I think, might be done as properly by general words of exclusion as by words of precise definition. The partial limit prescribed by the ordinance was, in my opinion, fully justified by the evidence that was laid before the court, and was no doubt within the knowledge of the council. I shall not discuss the testimony upon this point, but content myself with saying that when the size and population and surroundings of the borough are considered, and the unusual proportion of its area that was already devoted to the burial of the dead, the reasonableness of putting a stop to the establishment of new cemeteries (if that question is subject to review by a court) was, at the most, so fairly balanced that the discretion of the borough council should not be interfered with. For my own part, having read all the testimony on this subject, I agree that the discretion of the council was exercised properly, and for the public good.

The second defense is that the complainant's ground was an established cemetery in July, 1895, and therefore that the borough ordinance did not apply to it at all. Upon this point I find the facts to be as follows: In July, 1894, Alexander Harding was the owner of 90 acres of unimproved land in the borough of Yeadon, including the two tracts in controversy, of 75 acres and 12 acres respectively, and 3 acres more, which will be further referred to in a moment. As already stated, the first two tracts are not contiguous, and the 12-acre tract may be dismissed from further consideration with the remark that it is unimproved woodland on which nothing has ever been done to fit it for cemetery purposes. It is not connected in any way with the 75-acre tract, and—standing by itself, as it does—cannot be said to be an "established" cemetery in any sense of that word, whatever Harding's grantees may have intended ultimately to do with it.

In July, 1894, Dutton, who had conceived the idea of laying out a cemetery on this tract, obtained an option from Harding to buy 3 acres

at $5,000, and the remaining 87 acres at $135,000. A separate settlement was to be made for the 3 acres on or before October 1, 1894, and for the 87 acres on February 1, 1895. On October 1, 1894, a settlement between Dutton and Harding was made for the 3 acres of land, the price was paid in full by Dutton, and a deed, dated July 11, 1894, free from incumbrance, was delivered to Joseph Costello, Dutton's appointee, who was a mere holder of the legal title, a "straw man," as he is sometimes called in the testimony. Harding also agreed that his grantee should have a right of way over the 75-acre tract to the 3 acres thus conveyed, even if the purchase of the 87 acres should not be carried out. A reason, and no doubt the principal reason, for this separate dealing with the 3 acres, is to be found in the fact that in March or April of 1894 Dutton had made a contract with the Machpelah Cemetery Society, whose burial ground was at 11th street and Washington avenue in the city of Philadelphia, whereby Dutton was to buy the ground of the society in Philadelphia, and was to exchange with the lot owners of the society lots in a new cemetery containing not less than 3 acres. He agreed further to move all the bodies at his own expense. Several other persons were interested with Dutton in this scheme which was carried out during the fall of 1894 and the spring of 1895. The bodies buried in the Machpelah Cemetery were removed to the 3 acres just referred to, and these acres were thereafter known as the Machpelah section of the North Mount Moriah Cemetery—Dutton and certain associates having taken out a charter of incorporation under this name on July 14, 1904, with a capital stock of $1,000, divided into 20 shares. In order to provide funds for the expense of moving the bodies to the 3-acre tract an advance of $25,-000 was made by one Sinnott in the fall of 1894, which was secured by a mortgage on the ground of the Machpelah Cemetery in Philadelphia, and was guarantied by complainant Carpenter and another of the interested parties. The advance was made upon the agreement that the land of the Machpelah Society which Dutton had bought should be sold, that the mortgage should be paid, and the profits should be divided, $9/17$ to Sinnott and the guarantors of the mortgage, and $8/17$ to Dutton and his friends, as owners of the land. In the fall of 1895, after the ordinance under consideration had been passed, the ground of the Machpelah Society in Philadelphia was sold for a price large enough to pay Sinnott's mortgage, with the additional expense of moving the bodies, and to produce a net surplus of about $40,000. On December 3, 1895, Joseph Costello, the holder of the legal title, at the direction of the real parties in interest, executed and delivered to the North Mount Moriah Cemetery a deed for the 3 acres, known as the Machpelah section.

Sometime after the incorporation of the North Mount Moriah Cemetery Company Dutton and his associates communicated to Harding their inability to carry out the purchase of the remaining 87 acres, unless Harding would accept at par $30,000 of stock in the company, in lieu of a like amount of cash. In December, 1895, after further negotiations between Dutton and Harding for a modification of the original contract, a new agreement and a settlement thereunder were made, whereby Harding accepted, in lieu of $135,000 in cash and mort-

gages and $7,500 in stock in the company, as had been stipulated in the original agreement, a total payment of $105,000 in cash and mortgages, and $37,500 of full-paid stock in the company; and thereupon he delivered to Costello, Dutton's appointee, a deed for the 87 acres subject to an existing mortgage of $48,000—which was counted as part of the price—and took from Joseph Costello, in part payment, a purchase-money mortgage for $25,000; and on the same day Costello conveyed the 87 acres, mediately through Charles S. Baker—another "straw man"—to the North Mount Moriah Cemetery Company, subject to the mortgages just referred to.

Not long afterward stock of the company was issued for the land obtained from Harding, and was delivered in certain proportions between Dutton, Sinnott, and others interested in the enterprise. To carry out the agreement among themselves, the stock was increased to 8,000 shares, or $400,000. Of these, 6,000 shares were issued on December 20, 1895, to Baker, the straw man to whom the intermediate deed from Costello had been made, and Baker forthwith divided the stock among the interested parties, various other straw men taking title for Sinnott and others, and forming a majority of the board of directors. In this manner the complainant Carpenter became the owner of 1,066 shares—$50,300—for which he never paid anything, except as he was interested in the proceeds of the sale of the Machpelah Society's land. His interest was based upon the soliciting of the loan of $25,000 from Sinnott, and his ratable guaranty of the mortgage that had been given to secure that loan upon the ground of the Machpelah Society.

The following paragraph, which has my approval, is taken nearly verbatim from the brief of defendant's counsel, and contains other facts bearing on the question now under consideration.

"The North Mount Moriah Cemetery Company never had any subscription or underwriting of its stock, and never was in a financial position to develop and maintain a cemetery on the 87 acres. The only money—other than that derived from the sale of the ground of the Machpelah Cemetery Society in Philadelphia—that was contributed to the enterprise in consideration of stock was $1,000 contributed by William Bradley and applied on the contract for the 87 acres, and $5,000 contributed by Dutton and applied in acquiring a clear title to the 3 acres. All other money was contributed in the form of loans or extensions of credit by Carpenter, Wilkinson, Sinnott, and Dutton, amounting to $3,000 or $4,000, principally to pay interest. All suggestions for contributions of cash to the treasury by the members of the company, all efforts to borrow money on the credit of the enterprise, and all suggestions for the sale of any part of the 2,000 shares of treasury stock, proved abortive. No work was ever done upon the 87 acres by the promoters, or by the North Mount Moriah Cemetery Company, other than a preliminary survey and the preparation of a proposed plat; the grading of a road from the 3-acre tract south, through the 87 acres to Whitby avenue, being the right of way due the Machpelah section; and grading to a slight extent upon one or two connecting roads. A copy of the plat will be found in the complainant's record. No interments were ever made, and no burial lots were ever sold in the 87 acres. The principal business done by the board of directors between December 20, 1895, and April, 1898, was to pass resolutions every quarter providing for the extension of the company's notes for money borrowed. In the spring of 1898 the North Mount Moriah Cemetery Company, being without funds or hope of success, abandoned the enterprise, so far as the 87 acres were concerned, and, being in default for interest on the Harding mortgage of $25,000, the mortgagee foreclosed. Finally a sheriff's sale in foreclosure was

had on May 28, 1898, and the complainant, Carpenter, bought the 87 acres for $50,000, subject to a mortgage of $48,000 and accrued interest. The sheriff's deed to Carpenter was dated July 13, 1898."

Upon these facts, I do not think it can be successfully contended that a cemetery had been "established" upon the 87 acres, or upon any part of either tract making up that area, in July, 1895, when the ordinance was passed. The scheme was purely speculative then, a promoter's enterprise, lacking the needful funds to carry it through, and nursed along in the hope that the money might be found by and by. Lots could not be sold and were not sold, they were not even laid out on the ground, and it is clear that no attempt was made to use the 87 acres, or any part of it, as a cemetery, for several years after the ordinance was passed. To speak of a scheme like this as an "established" cemetery would be, I think, to stretch the word far beyond its ordinary and proper meaning.

I shall not extend this opinion by discussing the cases that were cited by counsel for either party. They have all been examined and considered to the best of my ability, and I find nothing in any of them to cause me to doubt that the complainant has failed to make out his case.

A decree may be entered dismissing the bill, with costs.