CARPENTER v. BOROUGH OF YEADON et al.

(Circuit Court of Appeals, Third Circuit. February 28, 1908.)

No. 12.

1. CEMETERIES—POWER TO REGULATE—PENNSYLVANIA BOROUGH ACT.

An ordinance passed by a borough council in Pennsylvania prohibiting the enlargement of existing cemeteries "by adding thereto or using for purposes of interment ground not now owned by the owners of such cemeteries," and prohibiting the interment of any human body in any place within the borough "except in ground now used as a cemetery or burying ground," is within the power conferred upon boroughs by Act 1851 (P. L. 322) to prohibit within the borough all interments or within partial limits, and such act is within the undoubted power of the Legislature.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Cemeteries, § 1.]

2. SAME—LANDS CONSTITUTING CEMETERY.

Evidence considered and held insufficient to establish that either of two tracts of land were owned by the owners of a cemetery or used as a cemetery or burying ground within the meaning of such ordinance at the time of its passage, because of an option for their purchase then outstanding through which they were afterward acquired by the owner of another tract which was then so used.

Gray, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 151 Fed. 879.

E. Waring Wilson and John G. Johnson, for appellant.

O. B. Dickinson, Isaac E. Johnson, and Dwight M. Lowrey, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below, Joseph L. Carpenter, Jr., a citizen of Delaware, filed a bill in equity against the

borough of Yeadon, Delaware county, Pa. Carpenter bought 87 acres of land in said borough in 1898. In 1904, he attempted to inter a human body therein, but was refused a burial permit by the borough by virtue of its ordinance of July 29, 1895, which, inter alia, provided:

"Sec. 2. The enlargement of the existing cemeteries or burying grounds within the borough, by adding thereto or using for purposes of interment of ground not now owned by the owners of such cemeteries or burying grounds respectively, is hereby prohibited.

"Sec. 3. The interment of any human body in any place within the borough of Yeadon except in ground now used as a cemetery or burying ground, or without the requirements of the borough board of health having been complied with, is declared to be a nuisance, and is hereby prohibited."

Thereupon this bill was filed to test the validity of this ordinance and its applicability to said land. On final hearing the court below held the ordinance valid; that Carpenter's ground did not come within its exception, and dismissed the bill. Thereupon he appealed to this court.

Turning first to the validity of this ordinance, it is clear the power of the state of Pennsylvania to control and prohibit burials in municipalities cannot be controverted. In Kincaid's Appeal, 66 Pa. 423, 5 Am. Rep. 377, the Supreme Court of that state said:

"No one can doubt the power of the Legislature to prohibit all future interments within the limits of towns or cities. In ancient times, in Greece and Rome, such was the universal rule. It was one of the laws of the twelve tables 'hominem mortuum in urbe ne sepelite neve vicinitate.' It is much to be regretted that it was not adopted as our policy at an early period. This is no invasion of any right of property. Every right, from an absolute ownership down to a mere easement, is purchased and held subject to the restriction that it shall be so exercised as not to injure others. Though at the time it may be remote and inoffensive, the purchaser is bound to know at his peril that it may become otherwise, by the residence of many people in its vicinity, and that it must yield to laws for the suppression of nuisances. If conditions or covenants, appropriating land to some particular use, could prevent the Legislature from afterwards declaring that use unlawful, legislative powers necessary to the comfort and preservation of populous communities might be frittered ed away into perfect insignificance."

Such a power the state may exercise through municipalities. In Klinger v. Bickel, 117 Pa. 326, 11 Atl. 555, it was said:

"Nor can it be doubted that the Legislature may confer the same power upon municipal corporations, such as cities and boroughs. They are but subdivisions of the state, created by the state, for the comfort and convenience of the citizens, dwelling therein. The state confers upon them a portion of its sovereignty for the purpose of enabling them to control their local affairs."

By its general borough act of April 3, 1851 (P. L. 322), under which Yeadon borough was formed, the state conferred upon it power "to prohibit within the borough the burial or interment of deceased persons, or within such partial limits within the same as they may from time to time prescribe," and, in pursuance thereof, the borough enacted an ordinance which prohibited "the interment of any human body in any place within the borough of Yeadon except in ground now used as a cemetery or burying ground." The act of 1851 having conferred a defined and unqualified power, viz., "to prohibit all interments, or interments within partial limits, of boroughs," this ordinance, which fixes limits within which interments shall or shall not be made, is an exer-

cise of such defined power, and therefore, its propriety or reasonableness is not open to judicial question. "In other words, what the Legislature distinctly says may be done cannot be set aside by the courts because they may deem it to be unreasonable or against sound policy." Dillon on Municipal Corporations (4th Ed.) § 328. To the same effect are District of Columbia v. Waggaman, 4 Mackey (D. C.) 328; Haynes v. Cape May, 50 N. J. Law, 56, 13 Atl. 231. "The local government," says the Supreme Court of Pennsylvania, in Livingston v. Wolf, 136 Pa. 533, 20 Atl. 552, 20 Am. St. Rep. 936, "must keep within the limits that bound its jurisdiction as they are defined by the Constitution and the laws of the state; but subject to these restrictions, it may determine what is best calculated to promote the security, the comfort, and the convenience of the inhabitants."

The ordinance, then, being valid, it remains to consider whether the land in question is excepted from its provisions. This depends on whether, at the date of its passage, Carpenter's land was "now used as a cemetery or burying ground." These are plain, simple words. There is no question as to their meaning. The ordinance test is not ownership or intention to use, but actual use. Now, at the date of this ordinance no person had been buried in either tract. It is true a promoter's plot of 75 acres of this tract had been made, but even this was never recorded, staked on the ground, or adopted by any one. In point of fact these tracts were then under lease for farming purposes to one Ralston, whose rent for 1895 was $750, and Carpenter's predecessors in title, who are alleged to have used the ground as a burying ground, took title under an agreement in which they "agreed that the premises are in tenure of a tenant under a yearly lease, and will be conveyed subject to said lease." The fact then being that, at the date of the ordinance, the land was not used as a cemetery or burying ground, it did not come within the ordinance exception. It is contended, however, that the equitable title to this property was, at the date of this ordinance, vested in the North Mount Moriah Cemetery Company by virtue of an article of agreement between Harding and one Dutton for its sale, and that the legal title which the cemetery company acquired on December 20, 1895, related, through such equitable ownership, to the date of the article—July 6, 1894. After a careful study of all the proofs, we find that in point of fact the cemetery company acquired no equitable interest in the 87 acres here involved by such article. The money paid on account was not that of the corporation, but of Dutton and those comprising his syndicate, and that the money had not, when this ordinance was passed, or indeed, thereafter, been repaid or assumed by the cemetery company. Later than the date of the article one Wilkinson and his syndicate, of whom Carpenter was one, became interested in the land. These two syndicates, viz., Wilkinson's and Dutton's, removed some 15,000 bodies from a Philadelphia cemetery and reinterred them in a three-acre tract of the North Mount Moriah Cemetery Company adjoining the property in dispute, and received in payment therefor the proceeds from the sale of such abandoned Philadelphia cemetery. The proceeds of this venture belonged to the two syndicates, and was applied by them to the

purchase money of the land here in question. A settlement in writing was made December 20, 1895, of the $70,427.91 of purchase money by these two syndicates with Harding, the owner of the land, in which Harding gave credit for $30,000 paid to him in stock (which stock was furnished by the Dutton's syndicate), and "from C. B. Wilkinson the above balance of forty thousand four hundred and twenty-seven and $91/100$ dollars," as appears in Harding's receipt to Wilkinson. The conveyance was made by Harding's deed to one Costello, and the latter, on the day of this settlement, for a consideration of $62,000 conveyed the premises to Charles S. Baker, who on the same day deeded the same for $300,000 to the North Mount Moriah Cemetery Company, subject to $99,000 of mortgages. The North Mount Moriah Cemetery Company never had any money with which to purchase this land or any means of raising it. It paid the $300,000 in stock, not to Harding, but to Baker, and his stock went to the two syndicates. The land was subsequently sold from the cemetery company on foreclosure of mortgage. The proofs satisfy us that this cemetery company acquired no interest in these tracts prior to the deed to it from Baker of December 20, 1895, and that Costello and Baker were the representatives, not of the cemetery company, but of the syndicates of Wilkinson and Dutton. It will thus be seen that the land in question falls within the prohibition of section 3 of the ordinance, as being at the time of its passage not "now owned by the owners of such cemeteries or burying grounds."

This view renders it unnecessary for us to discuss in detail the evidence to support the conclusion reached by the court below, with which we agree, that "the scheme was purely speculative, then, a promoter's enterprise, lacking the needful funds to carry it through, and nursed along in the hope that the money might be found by and by."

It follows, therefore, the decree of the court must be affirmed.

GRAY, Circuit Judge, dissents.