## CITY OF MARYSVILLE et al. v. STANDARD OIL CO. et al.*

Circuit Court of Appeals, Eighth Circuit.
May 28, 1928.

No. 7868.

1. **Courts ⬅365(24)—Ruling of state court that ordinance is within powers of municipality is conclusive on federal court.**

Ruling by highest court of state that ordinance is within scope of power conferred on municipality by Legislature is conclusive on federal court.

2. **Constitutional law ⬅238(1), 275(1)— Fourteenth Amendment does not prevent regulation of useful occupations which may prove injurious to public (Const. Amend. 14).**

The Fourteenth Amendment does not prevent regulation of useful occupations, which because of their nature and location may prove injurious to the public.

3. **Municipal corporations ⬅594(1)—Police ordinances are invalid only when lack of public health, safety, or welfare is plain.**

Ordinances passed in exercise of the police power are invalid only when it plainly appears that they do not tend in any appreciable degree to promote public health, safety, or welfare, and

*Rehearing denied September 17, 1928.

that legislative power has been exercised arbitrarily.

4. **Constitutional law ⬅320—Eminent domain ⬅2(1)—Destruction of property by exercise of police power is not "taking for public use" or "without due process."**

That property may be destroyed by legitimate exercise of state's police power is not a "taking for public use," and does not deprive owner of property without "due process" of law.

5. **Explosives ⬅3—That storage tanks have been long maintained and are well equipped is not controlling as to validity of regulatory ordinance.**

That storage tanks for gasoline, etc., have been long maintained under permit from municipal authorities, and are equipped with best safety devices, and carefully and efficiently operated, and are not located in most congested portion of city, is not controlling as to validity of ordinance requiring that they be placed underground.

6. **Explosives ⬅3—That small storage tanks are excepted is not valid objection to validity of ordinance.**

That ordinance requiring storage tanks for gasoline, etc., to be placed underground excepts small tanks containing less than 500 gallons of distillate or fuel oil, is not valid objection to validity of the ordinance.

7. **Explosives ⬅3—Evidence held not to support finding that tanks could not be operated underground.**

In suit to restrain enforcement of ordinance requiring storage tanks for gasoline, etc., to be placed underground, evidence *held* not to support master's findings that the tanks could not be operated, if placed underground.

8. **Appeal and error ⬅1022(3)—Findings and conclusions of master, approved by court, are not conclusive, and cannot prevail against evidence.**

Although conclusions, findings, and recommendations of a master, when approved by trial court, are presumed correct, they are not conclusive, and cannot prevail against clear evidence.

9. **Constitutional law ⬅240(1), 296(1)—Ordinance requiring gasoline storage tanks to be placed underground held valid exercise of police power (Const. Amend. 14).**

Ordinance requiring storage tanks for gasoline, etc. to be placed underground, attacked as unlawful and unjust discrimination, and as a denial of the equal protection of the laws and a deprivation of property without due process of law, in violation of Const. Amend. 14, *held* a legitimate exercise of city's police power, as applied to tanks so located that much property and many people were within potential destructive radius, if fires and explosions occurred.

10. **Injunction ⬅194—In suit to enjoin enforcement of ordinance, court may relieve plaintiff from penalties during time they were testing validity.**

In suit to enjoin enforcement of ordinance requiring storage tanks for gasoline, etc., to

be placed underground, and imposing penalties of $25 a day for violations, court, though holding ordinance valid, may relieve plaintiff from payment of penalties while they were taking seasonable steps to test validity of the ordinance.

Phillips, District Judge, dissenting.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suits consolidated for trial by the Standard Oil Company and another against the City of Marysville and others. From a decree for plaintiffs, defendants appeal. Reversed and remanded, with directions.

Edgar C. Bennett, of Marysville, Kan., Harry W. Colmery, of Topeka, Kan., for appellants.

Earle W. Evans, of Wichita, Kan. (C. W. Martyn, of Chicago, Ill., R. R. Vermilion, Joseph G. Carey, W. F. Lilleston, and Henry V. Gott, all of Wichita, Kan., of counsel), for appellee Standard Oil Co.

Thomas F. Doran, of Topeka, Kan. (Roy T. Osborn, of New York City, and Clayton E. Kline, of Topeka, Kan., on the brief), for appellee Sinclair Refining Co.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. On the 8th day of October, 1923, the mayor and council of the city of Marysville, Kan., passed and approved Ordinance No. 350 in the words and figures following:

"An ordinance regulating the storage of gasoline, kerosene, naphtha, distillate, fuel oil, crude oil, and other inflammable and combustible liquids within the city of Marysville, Kansas, and repealing Ordinance No. 333 and section 4 of Ordinance No. 237.

"Be it ordained by the mayor and council of the city of Marysville, Kansas:

"Section 1. It shall be unlawful for any person, firm or corporation to keep or store within the corporate limits of the city of Marysville, Kansas, any gasoline, kerosene, distillate, fuel oil, crude oil, or other inflammable or combustible liquid otherwise than in tanks, barrels or other containers which shall be buried at least three feet under ground.

"Sec. 2. Any person, firm or corporation who shall maintain any underground tank yard shall keep same fenced securely and shall keep at least six inches of gravel, chat, cinders or other large aggregate over the said area so occupied by tanks, and shall keep and maintain such tank yard in a clean, orderly manner, free from rubbish, weeds, trash or other inflammable substances.

"Sec. 3. This ordinance shall in no case apply to the storage of any crude oil, distillate or fuel oil in containers of a capacity of 500 gallons or less, but only one such 500 gallon container shall be permitted on each premises, nor, shall it apply to the storage of gasoline, kerosene or naphtha in quantities of less than 10 gallons, all of which commodities in the quantities mentioned and permitted by this section shall be kept and stored in the manner as now provided by existing ordinance.

"Sec. 4. Ordinance No. 333 and section 4 of Ordinance No. 237 are hereby expressly repealed.

"Sec. 5. Any person, firm or corporation violating any of the provisions of this ordinance shall upon conviction be adjudged to pay a fine of $25.00 for each such violation, and each day that any of the commodities herein referred to are stored in violation of the terms hereof shall constitute a separate and distinct offense hereunder.

"Sec. 6. Any person, firm or corporation now storing any of the commodities herein mentioned in a manner otherwise than that herein provided shall be given until the 10th day of November, 1923, in which to bring themselves within the provisions hereof and comply herewith.

"Sec. 7. This ordinance shall be in force and take effect from and after its publication in the official city paper."

Ordinance No. 237, therein referred to, passed July 13, 1914, contained a provision that "isolated tanks, constructed for the storage of gasoline, fuel oil and motor spirits, in quantities of 5,000 gallons or more, may be constructed above ground at such locations as the mayor and city council may determine." Appellees filed bills of complaint in the District Court for the District of Kansas charging that the provisions of said Ordinance No. 350 requiring them to bury their tanks underground are arbitrary, unreasonable and impossible of performance "in that said tanks cannot be buried and that the enforcement of said ordinance will result in the absolute confiscation of plaintiff's property, in an unlawful and unjust discrimination against plaintiff, and in a denial to plaintiff of the equal protection of the laws and in the deprivation of its property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States, above quoted, and of the Constitution and laws of the state of Kansas," and pray-

ing that said ordinance be declared arbitrary, unreasonable, discriminatory and void for the reasons stated. Among other things, it was alleged that the ordinance was ultra vires the powers of the mayor and councilmen to pass because of lack of antecedent legislative authority conferred; that said tanks were constructed by permit procured from the mayor and council under the provisions of said Ordinance No. 237, and had been in operation for a long period without accident or injury to persons or property; that the business connected with the use thereof had been and was being carried on in a sanitary, safe, and legitimate way, and was equipped, maintained, and operated with the most modern, efficient, and best safety appliances and devices known; that it is more dangerous from the standpoint of public safety to operate oil tanks of this kind underground than to maintain and operate them above ground in the manner in which they are now maintained and operated; that the storage of such products in tanks operated above ground adjacent to railroads and railroad switches within cities and towns, including the city of Marysville, is a safe, useful, convenient and necessary incident and practice of the business required by modern methods of commerce, transportation and habits of life. The permission in the ordinance that smaller quantities of petroleum products may be stored above ground is attacked as discriminatory and as denying to appellees the equal protection of the law.

The cases were consolidated for trial and referred to a master, who made voluminous findings of fact and recommended a decree declaring said Ordinance No. 350 to be arbitrary, unreasonable, discriminatory, and confiscatory of appellees' property in violation of appellees' rights, and that appellants be perpetually enjoined and restrained from enforcing or attempting to enforce said ordinance. All exceptions to the master's report, except that of appellees to a portion of finding No. 81, were overruled, and a decree was entered conformably to the recommendation of the master.

This controversy may be decided almost entirely upon the facts found by the master. The mayor and council of the city of Marysville were led to pass and approve the ordinance in question by the following facts thus stated by the master:

"The record shows fires at five storage stations in Kansas; two in 1919, two in 1922, and one in December 1923 (the latter about two months after the ordinance was passed). * * * At Hays, Kan., in November, 1919, tanks of the Standard Oil Company containing gasoline and kerosene burned and exploded. One end of the gasoline tank was blown out and against an elevator 82 feet away, which it burned completely; whereas the main part of the tank was hurled in the opposite direction a distance of 475 feet, breaking off an 8-inch spruce tree en route and lodging against and burning up a dwelling house where it struck, and in the course of its travel killing 9 people, wounding at least 26 more, and burning several other houses.

"Fires at storage stations have occurred which so heated up the contents in the storage tank as to burst open the seams thereof and let gasoline run out and along the ground, burning in a flowing flame as it ran, igniting other property 30 to 60 feet away, and at other fires the flames have been known to shoot up into the air 50 to 100 feet high and be swept by the wind and set fire to and burn up property 60 to 75 feet distant therefrom; that the danger of fire to warehouses adjacent to storage tanks is great owing to the fact that there are kept and stored therein oils, greases, and petroleum products, which are highly combustible, easily ignited, and difficult to extinguish, and many instances have occurred where warehouses and storage tanks have become ignited by back-fires from automobile trucks, sparks from the gasoline engines used to pump the products to and from the storage tanks, sparks from static electricity created by the abrasion of metallic bodies or otherwise, in which cases tank wagons and smaller barrels and containers of petroleum products in the warehouses have exploded. Such fires produce extreme heat around the storage tanks, have broken the connections, or melted off the valves, thus permitting the gasoline to flow out of the tanks and burn, adding to the fire and intensity of the heat, and in those cases, should a safety device fail to operate, or should more gas pressure be formed than the venting devices could relieve, an explosion would occur."

Other destructive fires were at McCracken, Greenleaf, and Ft. Scott, all in the state of Kansas. The recital of the master and his conclusions with respect to the danger from fires in spite of all possible precautions and the employment of safety devices is fully supported by the evidence and by court decisions dealing with such questions. In Whittemore v. Baxter Laundry Co., 181 Mich. 564, 148 N. W. 437, 52 L. R. A. (N. S.) 930, Ann. Cas. 1916C, 818, the court said:

"We may also concede that in the instant case every precaution that human ingenuity has conceived has been made use of in the

construction of the tanks, as testified to by defendants' experts; considering, however, the dangerous character of the substance and its power as an explosive, of which in this age * * * we can well take judicial notice, and also considering human fallibility that accidents in the operation of the most perfect mechanism will occur, and all that needs to change what is a harmless agency, when properly protected, to a most dangerous explosive, is a careless person, can it be said that to have 20,000 gallons of such an agency stored within a few feet of one's dwelling house is not sufficient to be an unreasonable interference with the comfortable enjoyment of homes."

And in State v. Cozad, 113 Kan. 200, 202, 213 P. 654, 655, the court said:

"It is well settled that courts may take judicial notice of the inflammable and explosive qualities of gasoline and kerosene. * * * "

"We take judicial cognizance of the fact that gasoline, either alone or mixed with kerosene, constitutes a highly explosive agent." McLawson v. Paragon Refining Company, 198 Mich. 222, 164 N. W. 668.

"We may grant that the storage of gasoline on premises adjacent to other adjoining premises is not a private nuisance per se. It may, however, become such, considering the locality, quantity, and the surrounding circumstances, and would not necessarily depend upon the degree of care used in its storage. Heeg v. Licht, 80 N. Y. 579 [36 Am. Rep. 654]; 29 Cyc. 1177."

See, also, O'Hara v. Nelson (N. J. Ch.) 63 A. 836, 842, and Waters Pierce Oil Company v. Mayor, etc., 47 La. Ann. 863, 17 So. 343. To these citations unlimited additions may be made.

The tanks of the Standard Oil Company are located in block 40 of the original town of Marysville; those of the Sinclair Company in block 71 in said city. The findings of the master as to the proximity of structures to these two blocks are extended. A few only of such findings will be quoted, in order more clearly to disclose the environment:

"(b) In the north half of block 40, in a northwesterly direction from the Standard tanks, a hotel property occupies all said north half, except the extreme west and that extreme east, which is taken up by the railroad right of way. The hotel is a 2½ story structure, 40x80 feet, and is 145 feet from the Standard tanks. Southwest of the hotel, and adjacent to the alley, running through the center of block 40, is a large combined garage and barn. On the northwest corner there is

a residence 32x36 facing west on Sixth street, in the rear of which, adjacent to the alley running through the center of block 40, is a combined office and garage building. This home took first prize for beautiful homes in a contest in the city of Marysville.

"(c) The tanks of the Standard Company are a little less than two blocks south of Broadway, which is the main business street in the city of Marysville, and approximately 300 feet south of the edge of the fire limits on the north side of Elm street.

"(d) The south half of block 21, lying immediately north of block 40, is almost entirely used by the city for storing machinery, material, and tools, but in the southwest corner there is a residence, with a barn and two out buildings. The north half of block 21 faces on Broadway street, and is occupied by business property in the nature of a shoe store, barber shop, a large clothing store, and the city hall, a café and a city storehouse.

"(e) Block 22, lying northeast of block 40, is almost entirely business property. The north half fronts on Broadway and is solidly constructed. The south half contains a studio, a hotel, a large service garage, two small garages, a residence, and a new building under construction, which is 305 feet from the Standard tanks."

"(r) That within a radius of 100 feet from the center of the Standard Oil Company's tanks there are one residence, a warehouse, frame toolhouse, and the large coal bins. Within 200 feet there are four residences, two hotels, one warehouse, one toolhouse, a cement block works, the large coal bins, and six outbuildings. Within a radius of 400 feet there are 19 residences, 3 hotels, warehouse, toolhouse, large ice plant, cement block factory, 3 business buildings, and 20 barns, garages, and other outbuildings. Within a radius of 500 feet there is practically all the property heretofore described as in blocks 40, 21, 22, 39, 52, 51, 50 and 40."

Respecting the property of the Sinclair Company these additional findings are made:

"(b) Facing west and about midway of the south half of block 71, and on the extreme west side thereof, is the frame residence of J. H. Riepen, which is distant from the tanks of the Sinclair Company 58 feet. For a number of years prior to the erection of said tanks said residence has existed at said location, and has been occupied continuously by J. H. Riepen as his residence up to the present time. Immediately back of his residence there are two small frame outbuildings, 16 feet distant from the Sinclair tanks, and on the northeast corner of said property

is a frame barn or shed, 27 feet from the Sinclair warehouse, and immediately across the alley north from this barn are several other frame sheds.

"(c) That across the spur tracks, a distance of 62 feet from the Sinclair tanks, are two upright storage tanks of the Derby Oil Company, east of and in close proximity to which is the warehouse of said company; that further east are two upright storage tanks of the Cities Service Oil Company, a distance of 110 feet from the Sinclair tanks, and immediately north and a few feet distant is the warehouse of the Cities Service Company.

"(d) That along the right of way of the Union Pacific Railroad Company in block 71, and on the east side of the spur track, extending northeast and southwest of and across the alley dividing said block, there is a coal shed of the Bone-McLucas Lumber Company, 130 feet in length and 16 feet wide, of wooden construction, the southwest corner of which is approximately 75 feet from the Sinclair tanks, about the same distance from the tanks of the Cities Service Company, and about 60 feet from the tanks of the Derby Oil Company. In this coal shed is stored large quantities of coal.

"(e) In the north half of block 71, toward the west and facing north on Spring street, is a two-story frame residence, 166 feet from the Sinclair tanks; east of that there is another frame residence, immediately east of which is the warehouse and truckhouse of the Fenwick Oil Company, together with the three storage tanks of that company buried underground.

"(f) In block 50, lying directly north of block 71, the south half is occupied by four residences, two of which face south on Spring street and two east on Sixth street, together with three outbuildings, barns, garages, etc.; and in the north half of block 50 there are four residences, three facing north on Walnut street and one facing east on Sixth street, together with five barns, garages, and outbuildings."

The foregoing form but a small part of the structures found by the master to be located well within the danger line established by the experience of the fire at Hays, Kan., in November, 1919, to which reference has been made.

Other findings to which consideration is invited are that the Standard Oil Company, for more than 20 years prior to the commencement of this action, had maintained its storage stations upon its property in Marysville; that its tanks are not within the fire limits of the city; that it maintains there two tanks, with a capacity of 17,000 gallons each; that they are equipped with the best and most efficient safety devices and are operated in a careful and efficient manner; that it maintains more than 12,000 tanks similar to those in Marysville, and within the five years last past has had but 66 fires in connection with such property; that its storage tanks in the city of Marysville cannot be operated, if buried as required by the provisions of the ordinance; that the maintenance and operation thereof underground would be more dangerous to property and persons than the maintenance and operation above ground; that the location of said tanks is in a sparsely populated portion of the city; that there are no changed conditions in the buildings or improvements around the tank, which would warrant or justify that said tanks should be buried as required by the ordinance; that the same present no greater fire hazard than would a frame building, or a stock of groceries in a frame building, at the same location; that the action of water upon cinders, which are used for ballast upon the track of the Union Pacific Railway, which is about 20 feet from said appellant's station, creates an acid that corrodes and otherwise injures steel; that the natural flow and drainage is toward and upon the property occupied by the tanks of the Standard Oil Company; that there are numerous above-ground tanks in Marysville, containing from 100 to 500 gallons of distillate and fuel oil, which are maintained above ground under the authority of the ordinance and in close proximity to frame residences and business buildings; that under the ordinance any quantity of crude oil less than 500 gallons may be stored in tanks above ground; that crude oil is more dangerous than is gasoline or kerosene, and presents a greater hazard; that under the terms of the ordinance it is unlawful to keep more than 5 gallons of gasoline in a tank of an automobile, and a garage keeper, who stores cars, the tanks of which contain gasoline, violates the ordinance.

With respect to the Sinclair Company, it is found that that appellee has two tanks, of the capacity of 12,000 gallons each; that it has maintained and operated them for a period of 14 years prior to the commencement of this action; that one is used for the storage of gasoline, and the other for the storage of kerosene; that each of said tanks is so constructed that it cannot be buried as required by the provisions of the ordinance; and that compliance with the ordinance

would result in almost a total loss of said tanks and equipment. The greater safety of storage above ground as compared with that underground is restated.

Near the close of his report, under the Nos. 82, 83, 84, 85, and 86, the master makes findings, largely in the nature of a résumé, which greatly modify and condition many of his previous findings and conclusions:

"That distillate and fuel oil are not nearly so dangerous as gasoline and kerosene.

"That the objections which the plaintiffs make to the storing of gasoline and kerosene in tanks buried underground are that the maintenance of said tanks is very difficult; should leaks occur they could not be discovered, and the contents might penetrate through the earth, get into sewers, wells, and basements, and contaminate water and cause explosions, and that such leaks would develop through the effect of electrolysis and corrosion, eating out the metal of the tank, vibration and temperatures changing loosen the seams, and by the tanks being 'floated out' and breaking connections. With reference to the above objections the evidence shows:

"(a) That the conditions which produce electrolysis are not present in the city of Marysville, nor in block 40 and 71, where the tanks of the plaintiffs are located.

"(b) That the conditions which produce corrosion of metal underground are the acids in the soil combining with the oxygen in moisture, and sulphuric acid is a dangerous corrosive; and considering all the acid in the soil at the property of the Standard Oil Company in block 40 as sulphuric acid, it tests .049 to .07 per cent. acid, and that the property of the Sinclair Company in block 71 tests .025 per cent. acid. Although there is more chance of corrosion of metal underground of the Standard Oil Company property, it might take a term of years for it to occur.

"(c) That under the conditions existing in and around blocks 71 and 40 in the city of Marysville there would be vibration that might weaken the seams in tanks buried underground.

"(d) That the evidence shows that the seams of a tank underground might be weakened by temperature changes to such an extent as to cause the tank to leak. Such tanks are, however, subject to less changes in temperature than tanks above ground.

"(e) That tanks buried under 3 feet of ground in block 71 have not floated out during periods of rather heavy rainfall, and any danger of floating can be overcome by proper drainage of the surface water, by mounding up the earth, and by weighing, strapping, or anchoring down the tanks.

"(f) That tanks buried in compliance with Ordinance No. 350 would rest on a level 13 feet below the level of the ground; that the only sewers in and around blocks 71 and 40 are 10½ feet below the level of the ground, and the evidence does not show that there are any wells anywhere in the vicinity. The soil in blocks 71 and 40 is a heavy black gumbo, shading gradually into a compact plastic yellow clay, and tests made thereof by attempting to force water through the same, by exerting a pressure of 14 pounds per square inch for 2½ hours, showed that only a few small drops of water came through, and the same test with gasoline, no gasoline came through.

"That the danger from fire or explosion due to lightning, which causes a great many fires in oil storage, is less in underground tanks than in above ground tanks.

"That the danger from fire or explosions due to static electricity is less in underground tanks than in above ground tanks.

"That the base rate of insurance on storage tanks of gasoline and kerosene underground is 50 per cent. of the base rate of tanks above ground."

As stated in brief and argument, the only question presented is whether the ordinance is so clearly arbitrary and unreasonable that it amounts to an improper exercise of the police power. Some well-established principles of law effectually remove from consideration many of the findings deemed to support the conclusion reached that the provisions of the ordinance assailed are arbitrary, capricious, discriminatory, and unreasonable. [1, 2] This same ordinance was before the Supreme Court of Kansas in Cities Service Oil Co. v. City of Marysville, 117 Kan. 514, 231 P. 1031, 43 A. L. R. 854. The ordinance was upheld on the ground that under the statutory power conferred upon the city "to enact all such ordinances as may be expedient for maintaining the welfare of the city, the council may regulate the manner in which kerosene and gasoline may be stored within the corporate boundaries." To this ruling, by the highest court of the state, that the ordinance is within the scope of the power conferred on the municipality by the Legislature, we should, and do, accord conclusive force. Reinman v. Little Rock, 237 U. S. 171, 35 S. Ct. 511, 59 L. Ed. 900. The Fourteenth Amendment does not prevent regulation intended to regulate useful occupations which, because of their nature and location, may prove injurious to the public. Murphy

v. People of the State of California, 225 U. S. 623, 32 S. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153.

"An ordinance passed in the exercise of the police power should be sustained, if there is room for a difference of opinion as to whether or not the public safety will be promoted thereby." McCray et al. v. City of Chicago, 292 Ill. 60, 126 N. E. 557, One who assails such an ordinance bears the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61–79, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160.

"If there is room for a fair difference of opinion as to the reasonableness of a municipal regulation the courts will not hold it void." 43 Corpus Juris, par. 315, pp. 302, 303; Dillon on Municipal Corporations (5th Ed.) vol. 2, § 591, pp. 928, 929.

"Every intendment is to be made in favor of the lawfulness of the exercise of municipal power making regulations to promote the public health and safety." Pierce Oil Corporation v. Hope, 127 Ark. 38, 191 S. W. 405, Ann. Cas. 1918E, 143; Desser v. City of Wichita, 96 Kan. 820, 153 P. 1194, L. R. A. 1916D, 246.

[3] The unreasonableness must be shown affirmatively and clearly. City of Chicago v. Washingtonian Home of Chicago, 289 Ill. 206, 124 N. E. 416, 6 A. L. R. 1584. Such ordinances may be declared invalid only when it plainly appears that they do not tend in an appreciable degree to promote the public health, safety, or welfare, and that the power to legislate has been exercised arbitrarily. Stubbe v. Adamson, 173 App. Div. 305, 159 N. Y. S. 751.

"The right to exercise the police power is a continuing one, and a business lawful to-day may in the future become a menace to the public welfare and be required to yield to the public good." Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. Ed. 169.

"The courts will not inquire into the expediency of legislation passed in the exercise of the police power, nor the reasons which prompted its adoption, so long as it appears that the legislative authority acted in good faith, in the exercise of a reasonable discretion, and not arbitrarily; nor will they overthrow such legislation merely because they differ with the lawmaking power as to its efficiency, when opinion is divided on the question." Union Oil Co. v. City of Portland (D. C.) 198 F. 441.

In Missouri Pacific Railway Company v. Humes, 115 U. S. 512–520, 6 S. Ct. 110, 112 (29 L. Ed. 463), the court said:

"If the laws enacted by a state be within the legitimate sphere of legislative power, and their enforcement be attended with the observance of those general rules which our system of jurisprudence prescribes for the security of private rights, the harshness, injustice, and oppressive character of such laws will not invalidate them as affecting life, liberty, or property without due process of law." Rast v. Van Deman & Lewis, 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679.

"While the police power of the state cannot be so arbitrarily exercised as to deprive persons of their property without due process of law or deny them equal protection of the law, it is one of the most essential powers of government and one of the least limitable—in fact, the imperative necessity for its existence precludes any limitation upon it when not arbitrarily exercised. A vested interest cannot because of conditions once obtaining be asserted against the proper exercise of the police power—to so hold would preclude development. Chicago & Alton R. R. v. Tranbarger, 238 U. S. 67 [38 S. Ct. 678, 59 L. Ed. 1204]; Hadacheck v. Sebastian, 239 U. S. 394 [36 S. Ct. 143, 60 L. Ed. 348]."

[4] That property may be destroyed as a result of the legitimate exercise of the police power of a state is not a taking of property for public use, and does not deprive the owner of it without due process of law. Resulting inconvenience or loss to the individual affected will not invalidate. Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Slaughter-House Cases, 111 U. S. 746, 4 S. Ct. 652, 28 L. Ed. 585; Commonwealth v. Nolan, 189 Ky. 34, 224 S. W. 506, 11 A. L. R. 202; City of Chicago v. Washingtonian Home of Chicago, 289 Ill. 206, 124 N. E. 416, 6 A. L. R. 1584. Judges may not substitute their judgment for that of the city council fairly exercised. The remedy proposed must have a fair relationship to the danger sought to be minimized or removed. Zahn v. City of Los Angeles, 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074. If the question of reasonableness be fairly debatable an ordinance of this nature will be sustained. Radice v. People, 264 U. S. 292–294, 44 S. Ct. 325, 68 L. Ed. 690. Where "the object to be accomplished is conducive to the public interests, it [the Legislature] may exercise a large liberty of choice in the means employed." Lawton v. Steele, 152 U. S. 133–140, 14 S. Ct. 499, 502 (38 L. Ed. 385).

[5, 6] It is thus apparent that the fact that appellees have maintained their storage stations upon their property for a long period, under permit from the municipal authorities; that the same are equipped with the best and most effective safety devices and are operated in a careful and efficient manner; that the location of the tanks is in a less congested portion of the city—can have no necessarily controlling effect upon the validity of this ordinance. It is in evidence that the city is growing in population and extending in improvements; that development in, about, and beyond the location of these tanks is in prospect. It appears from the testimony and the findings that destructive fires have occurred, and loss of life has been occasioned, from tanks of the same general nature located as these tanks are; that much property and many people in the city of Marysville are within a potential destructive radius, if fires and explosions should occur. It must be conceded that such results are to be apprehended, despite every precaution in the way of human ingenuity has conceived in the way of construction, safety devices, and careful operation. It is no valid objection that small tanks containing distillate and fuel oil, which are found by the master to be not nearly so dangerous as gasoline and kerosene, are permitted by the ordinance to be stored above ground. The classification made is sufficiently distinctive. The large storage tanks of appellees, and the nature of their business, may not legitimately be compared with private consumers or those engaged in small retail business. All possible hazards cannot be eliminated in any community.

[7] The master finds that the storage tanks of the Standard Company cannot be operated, if buried as required by the provisions of the ordinance, and that those of the Sinclair Company are so constructed that they cannot be buried, and that compliance with the ordinance would result in almost a total loss of said tanks and equipment. We do not think this finding is sustained by the record. Even if it be true that these particular tanks could not themselves be placed underground without their destruction, that in itself would afford no support to the conclusion reached by court and master. Mugler v. Kansas, supra. We assume that the master limited his finding to the particular tanks now upon the ground. He could not have meant that tanks of this size and character cannot be placed underground, in accordance with the provisions of the ordinance, and operated.

It is disclosed, without contradiction, that the tanks of the Fenwick Oil Company, three in number and containing 11,750 gallons each, have been placed underground in obedience to this ordinance and are operated successfully. Mr. Fenwick states that two of these tanks have been so placed for a period of two years, and one for a period of one year; that inlet and outlet pipes have been installed. When he put down the last of these tanks, the side of one of the others was exposed. It was found not to be rusted or corroded and was in as good condition as when installed. With a measuring stick properly treated with paint he is able to gauge the amount of liquid in the tanks within ten gallons. He finds that in two years the temperature has never been higher than 65 degrees and never lower than 54 degrees—a range that within common knowledge would not disturb the integrity of the tanks. He has experienced no leaks, and his tanks have never been floated out as contended, even during torrential rains that flooded sewers and surface ditches. His experience with tanks has demonstrated that the underground tank has an advantage in that there is less evaporation, and, therefore, less waste. He has found no buckling nor opening of the seams. It will be noted that the Fenwick tanks are in the same city block as the Sinclair tanks. Independently of this testimony, or based thereon, the master found that any danger of floating can be overcome by proper drainage of the surface water by mounding up the earth, and by weighting, strapping, or anchoring down the tanks.

It is urged by appellees that the placing of tanks of this size in underground pits is attended by strain which would inevitably cause leaks. It is entirely conceivable, however, that such tanks can be thoroughly tested after being installed upon firm foundations, and this defect remedied before they are used as containers. The pit as originally constructed need not, of course, be so restricted to the exact size of the tank that this cannot be done; also, by concreting and other means, the possibility of leaking and resulting seepage may be minimized, if not substantially prevented. It may be that the expense of underground installation would be thus increased; but this, if true, would not militate against the validity of the ordinance. It is also apparent, from the experience of the Fenwick Oil Company that the difficulties attending the installation, maintenance, and operation of tanks underground are not insuperable.

Of the objections made by appellees, the master finds, further, that the dangers to underground tanks from electrolysis, from

lightning, from fires or explosions due to static electricity, are less than in tanks above ground, and that the base rate of insurance on such tanks underground is but 50 per cent. of the base rate of tanks above ground. The judgment of risk companies, founded upon self-interest and wide experience, is very persuasive. The master also finds that the danger of corrosion in case of the Sinclair tanks is negligible, and in the case of the Standard so remote that it would probably take "a term of years for it to occur." With respect to the seepage, the finding is that tanks buried in compliance with this ordinance would rest on a level considerably below that of sewers in and around these blocks. He also finds that "the soil in blocks 71 and 40 is a heavy black gumbo, shading gradually into a compact plastic yellow clay, and tests made thereof by attempting to force water through the same by exerting a pressure of 14 pounds per square inch for $2\frac{1}{2}$ hours, showed that only a few small drops of water came through, and the same test with gasoline, no gasoline came through." It thus appears that the danger from seepage into sewers and basements is so remote as to be worthy of small consideration. This finding accords with the best expert testimony introduced. It is true that a number of witnesses, most of them in the service of appellees, testified that in their opinion such seepage danger was to be apprehended. The expert testimony of chemists and fire and water chiefs was conflicting, but in our judgment the evidence upon this phase of the controversy preponderated in favor of the theory of appellants. The most that can be said in favor of the finding of danger in this respect is that it is a debatable question.

This leaves the finding that under the conditions existing in and around blocks 71 and 40 in the city of Marysville there would be vibrations "that might weaken the seams in tanks buried underground." This also is debatable, and is not justified by the experience of the Fenwick Oil Company, which is the only concrete experience contained in the record.

[8-10] We are not unmindful of the rule that the conclusions, findings, and recommendations of a master, when approved by the trial court, are presumed to be correct. They are not conclusive, however, and cannot prevail against clear evidence. In this case, however, the burden is upon appellees to establish the unreasonableness, and therefore the invalidity, of the ordinance by clear proof. The master seems to have based his conclusion largely upon considerations of the inconvenience and greater burden imposed upon appellees by the ordinance. Believing that greater danger will result from underground storage, he has, in large measure, substituted his own for that of the controlling legislative judgment upon facts fairly debatable and subject to reasonable differences of opinion. Furthermore, in his résumé he has found that the greater number of the dangers incidental to the storage of gasoline and kerosene are removed by placing large containers underground. Whether these outweigh those accruing from underground storage is certainly debatable, and, if so, the legislative judgment must prevail. The court, stating that the findings were made upon conflicting proofs, and that it had contented itself with such a study thereof as showed that the many findings were supported by ample proofs, adopted and confirmed the findings and conclusions, and entered a decree accordingly.

We think that the record presents no evidence of arbitrary or capricious action on the part of the mayor and council of Marysville. Their action was taken in good faith, for the protection of the property and lives of the public. The remedy proposed bears direct relation to the danger sought to be averted. It is entirely conceivable that a buried tank is less likely to take fire and explode from many causes which otherwise threaten, and that, if an explosion should occur, the danger to surrounding property would, at least, be minimized. In such case, the municipal judgment must control. With policy, present or future, of the city, or of appellees, the courts can have no concern. It is accepted doctrine that, when the Legislature, in an effort to prevent any inquiry into the validity of a particular statute, so burdens any challenge thereof in the courts that the party affected is necessarily constrained to submit, rather than take chances of suffering the penalties imposed, it becomes a serious question whether the party is not deprived of the equal protection of the laws. Cotting v. Kansas City Stock Yards Co., 183 U. S. 79–102, 22 S. Ct. 30, 46 L. Ed. 92. However, there is no doubt of the power of the state to impose a punishment heavy enough to secure obedience to such orders after they have been found to be lawful. Wadley Southern Ry. v. Georgia, 235 U. S. 651–667, 35 S. Ct. 214, 59 L. Ed. 405. In the latter case the holding in Willcox v. Consolidated Gas Co., 212 U. S. 19–53, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, to the effect that

penalty provisions are separable, and, though invalid, do not defeat the balance of the statute, is approved. In the instant case the penalties provided are neither enormous nor severe; but, rather, are reasonably calculated to secure obedience after the orders have been found to be lawful. Appellees were entitled to take seasonable steps to test the validity of the ordinance. They made their challenge with promptness and in good faith, and prosecuted it with diligence to a final determination. · In such case, we do not doubt our power, while sustaining that ordinance, to relieve from such penalties for the period during which this right was asserted, thereby guaranteeing the equal protection of the laws.

Being of opinion that the ordinance attacked was passed and approved with authority and in a legitimate exercise of the police power of the city, we conclude that the decree below must be reversed, and the cause remanded, with directions to dismiss the bill, upon condition that a reasonable time be accorded to appellees to conform to the provisions of the ordinance, and that appellants be perpetually enjoined from enforcing its penalty provisions until the expiration of such time.

It is so ordered.

PHILLIPS, District Judge. I respectfully dissent from the majority opinion, and shall undertake to state my reasons therefor:

Section 7 of Ordinance No. 350 of the city of Marysville, the validity of which ordinance is here in question, provides: "This ordinance shall be in force and take effect from and after its publication in the official city paper." It was published on October 11, 1923, and hence went into force and effect on that date.

Section 5 of this ordinance provides: "Any person, firm or corporation violating any of the provisions of this ordinance shall upon conviction be adjudged to pay a fine of $25.00 for each such violation, and each day that any of the commodities herein referred to are stored in violation of the terms hereof shall constitute a separate and distinct offense hereunder."

Section 6 of this ordinance provides: "Any person, firm or corporation now storing any of the commodities herein mentioned in a manner otherwise than that herein provided shall be given until the 10th day of November, 1923, in which to bring themselves within the provisions hereof and comply herewith."

The appellees, Standard Oil Company and Sinclair Refining Company, were engaged in storing in Marysville the commodities regulated by the ordinance at the time it went into force and effect, and hence under its terms had until November 10, 1923, to comply therewith.

The authority of the city council of the city of Marysville for 'the enactment of the ordinance in question was stated by the Supreme Court of Kansas in the case of Cities Service Oil Co. v. City of Marysville, 117 Kan. 514, 515, 231 P. 1031 (43 A. L. R. 854), as follows:

"The authority for its enactment, however, is to be found in the grant of power to the council 'to enact * * * any and all ordinances not repugnant to the Constitution and laws of this state, and such as it shall deem expedient for the good government of the city' (R. S. 14–401), and 'to enact and make all such ordinances, by-laws, rules, and regulations not inconsistent with the laws of the state as may be expedient for maintaining the peace, good government, and welfare of the city and its trade and commerce' (R. S. 14–439), and perhaps also in the section authorizing the council to 'regulate the construction of and order of suppression of * * * any apparatus used in any * * * business which may be dangerous in causing or promoting fires' (R. S. 14–421). The ordinance is therefore open to attack, not only upon the ground of unconstitutionality, but also upon that of being unreasonable in the circumstances in which its enforcement is undertaken."

The ordinance having been enacted under the general powers granted to the city of Marysville, its reasonableness is subject to inquiry by the courts. Cities Service Oil Co. v. City of Marysville, supra; Lusk v. Dora (D. C.) 224 F. 650; Moffitt v. Pueblo, 55 Colo. 112, 133 P. 754; Chicago Catholic Bishop v. Palos Park, 286 Ill. 400, 121 N. E. 561, 562; Huston v. Des Moines, 176 Iowa, 455, 156 N. W. 883, 892; Tarkio v. Cook, 120 Mo. 1, 25 S. W. 202, 203, 41 Am. St. Rep. 678; Carpenter v. Yeadon (C. C.) 151 F. 879, 882, Id. (C. C. A.) 158 F. 766; 43 C. J. 300.

A municipal ordinance will not be declared invalid on the ground of its unreasonableness, unless the unreasonableness thereof is made to clearly appear. Crowley v. Christensen, 137 U. S. 86, 11 S. Ct. 113, 34 L. Ed. 620; Guidoni v. Wheeler (C. C. A. 9) 230 F. 93. However, when such unreasonableness is clearly established, the courts may declare an ordinance invalid on that ground. Dobbins v. Los Angeles, 195 U.

S. 223, 238, 25 S. Ct. 18, 49 L. Ed. 169; Iowa City v. Glassman, 155 Iowa, 671, 136 N. W. 899, 40 L. R. A. (N. S.) 852; Standard Oil Co. v. Kearney, 106 Neb. 558, 184 N. W. 109, 110, 18 A. L. R. 95; 43 C. J. p. 312.

If there is room for a fair difference of opinion as to the reasonableness of the ordinance, the courts will not hold it void on that ground. Hartman v. Chicago, 282 Ill. 511, 118 N. E. 731, 732; Wagner v. St. Louis, 284 Mo. 410, 224 S. W. 413, 415, 12 A. L. R. 495.

The presumption is in favor of the reasonableness of the ordinance and the burden of proof to show its unreasonableness rests on the person asserting it. Real Silk Hosiery Mills v. Portland (D. C.) 294 F. 587; Yee Gee v. San Francisco (D. C.) 235 F. 757, 763–764; Guidoni v. Wheeler (C. C. A.) 230 F. 93, 98; Puget Sound Electric R. Co. v. Benson (C. C. A. 9) 253 F. 710, 715; 43 C. J. p. 310, § 323. I do not understand the rule to be that there must be no conflict in the evidence, but that it is sufficient if the unreasonableness of the ordinance be established by clear and satisfactory proof. Standard Oil Co. v. Kearney, 106 Neb. 558, 184 N. W. 109, 110, 18 A. L. R. 95; 43 C. J. p. 312, § 325.

The obvious purpose of the ordinance in question was to promote the public safety by protecting it from danger of fire and explosion. It is well settled that there must be a rational relation between the provisions of the ordinance and the purpose it is intended to accomplish. The provisions of the ordinance must tend toward the accomplishment of the object for which the power is granted. Ex parte San Chung, 11 Cal. App. 511, 105 P. 609, 611; Willison v. Cooke, 54 Colo. 320, 130 P. 828, 831, 44 L. R. A. (N. S.) 1030; People v. Ericsson, 263 Ill. 368, 105 N. E. 315, 317, L. R. A. 1915D, 607, Ann. Cas. 1915C, 183; Froelich v. Cleveland, 99 Ohio St. 376, 124 N. E. 212, 216; Dayton v. City Ry. Co. (C. C. A. 6) 16 F.(2d) 401, 403; 19 R. C. L. p. 805, § 112, 43 C. J. pp. 227, 228.

In the instant case the provisions of the ordinance in question to be reasonable and valid must be reasonably calculated to promote the public safety by decreasing the danger of fire or explosion incident to the storage of the commodities, which the ordinance undertakes to regulate. Dayton v. City Ry. Co., supra, page 403.

The test in the instant case is whether the requirements of the ordinance will tend to promote the public safety, when applied to the storage of gasoline and other like substances in large quantities. The question is whether storage of such commodities in large quantities below ground in accordance with the requirements of the ordinance is less hazardous than the existing practice generally adopted throughout the country of storing such commodities in large quantities in above ground tanks with approved safety devices.

The contention of the appellees was that underground storage of gasoline, kerosene, and kindred liquids, in large quantities, was much more hazardous than above ground storage. On this point, the master made findings numbered 28, 45, and 60, which read as follows:

"XXVIII. That the burying by said plaintiff of tanks equal in capacity to those so maintained by it as aforesaid in the city of Marysville as required by said Ordinance No. 350 would be attended with hazards which would render the maintenance and operation thereof underground more dangerous to property and persons than the maintenance and operation of said plaintiff's present tanks above ground."

"XLV. That it is more dangerous from the standpoint of public safety to keep and store gasoline or kerosene in quantities of 10,000 gallons or more under the ground than it is to store the same quantities thereof above ground."

"LX. That the burying of said plaintiff's tanks, or new tanks of equal capacity, as required by Ordinance No. 350, would be attended by hazards which would render the maintenance and operation of such tanks underground more dangerous to property and persons than the maintenance and operation of said plaintiff's present tanks above ground."

The master also made the following conclusions of law:

"II. That sections numbered 1 and 3 of said Ordinance No. 350 of the defendant, the city of Marysville, Kansas, and each and every provision thereof, is arbitrary, capricious, discriminatory, unreasonable, and subversive of the rights of plaintiff, and void."

"III. That Ordinance No. 350 of the defendant, the city of Marysville, is arbitrary, capricious, discriminatory, unreasonable, and subversive of the rights of the plaintiffs, and void."

In support of their contention, appellees called a large number of witnesses of expert knowledge, based on practical and extensive experience in the storage and handling of gasoline, kerosene, and like commodities, in large quantities. These witnesses

testified that the above ground storage was much safer, and gave very cogent reasons therefor. They stated that, in the storage of these products in large quantities, the greatest hazard of fire and explosion comes from leakage; that leakage is much more apt to result and less easily detected in underground storage; that leakage results from corrosion, from strain upon seams and rivets incident to insulation, from change in temperature, and like causes. They stated, further, that leakage in above ground tankage is first indicated by sweating; that it can be readily detected and repaired before the leakage in any substantial amount occurs. They further explained how such leakage underground could not be detected, either from inspection or from measurement; that inspection is prevented, because the tank is covered up, and measurement is impossible, because, if the tank is not exactly horizontal, the measurement is certain to be inaccurate. They further explained how gasoline escaping from underground leakage would travel through the soil to earth pockets, cellars, sewers, and the like, and thereby create fire and explosion hazards. As against this, the appellants introduced evidence of witnesses who gave as their opinion that underground storage is the safer, but none of these witnesses were able to testify from knowledge gained through practical experience in the handling of such products in large quantities. A very analogous situation arose in the case of McCray v. City of Chicago, 292 Ill. 60, 126 N. E. 557. The court in that case said:

"It is argued by counsel for appellees that the evidence shows that there is a fair difference of opinion among those experienced in the use of such materials as to whether or not Preferred Bestwall is a good substitute for wood lath and plaster. It is true that some of the witnesses for the city testified that ordinary Bestwall, or substitutes other than the one here under consideration, less than three-eighths of an inch thick, were not equal to wood lath and plaster, but only one of these witnesses for the city, as we read the record, had ever had any experience with Preferred Bestwall three-eighths of an inch in thickness, such as is here under consideration, and he had only made one test of this Preferred Bestwall, and that while the case was being tried in the superior court, by placing a piece a few inches in size in an oven, where it was tested under a temperature of 221 degrees Fahrenheit.

"A large amount of testimony was taken on behalf of appellants. * * *

27 F.(2d)—31½

"These witnesses were men of the highest standing in their respective lines of work, and their testimony was based on an extensive study through a large number of comparative experiments and tests of different kinds of wall material."

In concluding, the court said:

"We agree with counsel for appellees that an ordinance is not discriminatory where it operates on all persons engaged in the same business or calling alike, and where there is no other calling or business in precisely the same position (2 Dillon on Mun. Corp. [5th Ed.] § 593); also that an ordinance that fairly tends to serve and promote the public health or safety is reasonable (Spiegler v. City of Chicago, 216 Ill. 114, 74 N. E. 718); that any one attacking an ordinance, because unreasonable, must show affirmatively wherein the ordinance is unreasonable (People v. Cregier, 138 Ill. 401, 28 N. E. 812; Swift v. Klein, 163 Ill. 269, 45 N. E. 219); that courts will not disturb an ordinance of the character here in question, when there is room for a difference of opinion as to whether or not the public safety will be promoted by the provisions of the ordinance (City of Chicago v. Mandel Bros., 264 Ill. 206, 106 N. E. 181); that, on a question whether or not a particular thing may or may not be detrimental to public safety, the determination by the legislative body, if it has not acted unfairly or arbitrarily, will be held conclusive (North Chicago City Railway Co. v. Town of Lake View, 105 Ill. 207, 44 Am. Rep. 788; Laugel v. City of Bushnell, 197 Ill. 20, 63 N. E. 1086, 58 L. R. A. 266). There can be no question, also, that the power to declare an ordinance void, because it is unreasonable, is one that should be carefully exercised, and the court will not interfere simply because it believes that a different regulation might have been wiser or better, but the court will not hesitate or interfere when it is clearly manifest from the evidence that the city authorities have acted in an arbitrary manner in passing an ordinance.

"We believe the ordinance in question is unjust and oppressive in its discrimination as to the material to be used for the partitions and ceilings of the rooms in ordinary dwelling houses. This being so, it must be held that these provisions of the ordinance are void, and should have been so declared by the trial court."

Counsel for appellants make the contention that, because of the peculiar character of the soil at the points where the tanks of the appellees are located in the city of

Marysville, danger from seepage through the soil does not exist. They base this upon a test made by one of their witnesses in attempting to force water through such soil, under pressure. The majority opinion lays some emphasis on this experiment. Gasoline is to-day a commodity in common use. Its characteristics are a matter of common knowledge. They are so well and commonly known that a court, in my opinion, may take judicial notice thereof. We know that it is extremely difficult to hold gasoline within containers, that it will escape through the smallest opening, and that it will permeate any kind of soil. Dr. H. P. Cady, upon whose testimony the contentions with reference to the character of the soil are largely based, on cross-examination, testified:

"Nothing in the way of earth is impervious to water, and it is not as impervious to gasoline as it is to water. Gasoline will leak through cracks that will hold water pretty well."

I therefore am of the opinion that the conclusion is inevitable that gasoline escaping through leakage from underground tanks, regardless of the imperviousness of the soil, would probably travel to pockets, cracks, sewers, cellars, and like places, as testified to by the witnesses for the appellees.

The fact that the witnesses for the appellees base their opinions and conclusions upon knowledge gained through practical and extensive experience, the fact that they gave such cogent reasons for their conclusions, and the fact that the conclusions of the witnesses for the appellants were largely theoretical, and not based on practical knowledge and experience, lead me to the conclusion that the evidence on this controverted point clearly and satisfactorily established that the provisions of the ordinance, instead of tending to promote the public safety, tended in the opposite direction, and that compliance therewith would increase, instead of decrease, the hazard from fire and explosion resulting from the storage of gasoline and like substances in large quantities. If this be true, the findings above quoted, made by the master and confirmed by the trial court, should be adopted by this court.

If these findings are true, the ordinance in question is not reasonably calculated to accomplish its intended purpose, and is therefore unreasonable and void.

Under the terms of the ordinance appellees were required to comply therewith on the 10th day of November, 1923. Instead of complying with the ordinance, they attacked its validity and obtained an injunction against its enforcement. If the ordinance is valid and may be enforced according to its terms, appellees are each subject to a fine of $25 for each day intervening since November 10, 1923, to the present day. Such fines would amount in the aggregate to many thousands of dollars.

In Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 101, 102, 22 S. Ct. 30, 39 (46 L. Ed. 92), the court said:

"A statute (although in terms opening the doors of the courts to a particular litigant) which places upon him as a penalty for a failure to make good his claim or defense a burden so great as to practically intimidate him from asserting that which he believes to be his rights is, when no such penalty is inflicted upon others, tantamount to a denial of the equal protection of the laws. * * * It is doubtless true that the state may impose penalties such as will tend to compel obedience to its mandates by all, individuals or corporations, and if extreme and cumulative penalties are imposed only after there has been a final determination of the validity of the statute, the question would be very different from that here presented. But when the Legislature, in an effort to prevent any inquiry of the validity of a particular statute, so burdens any challenge thereof in the courts that the party affected is necessarily constrained to submit rather than take the chances of the penalties imposed, then it becomes a serious question whether the party is not deprived of the equal protection of the laws."

In Ex parte Young, 209 U. S. 123, 147, 28 S. Ct. 441, 449 (52 L. Ed. 714, 13 L. R. A. [N. S.] 932, 14 Ann. Cas. 764), the court said:

"It may therefore be said that, when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights."

See, also, Wadley Southern Ry. Co. v. Georgia, 235 U. S. 651, 661, 666, 35 S. Ct. 214, 59 L. Ed. 405; Missouri Pac. Ry. v. Nebraska, 217 U. S. 196, 207, 208, 30 S. Ct. 461, 54 L. Ed. 727, 18 Ann. Cas. 989; Missouri Pac. Ry. Co. v. Tucker, 230 U. S. 340, 349, 33 S. Ct. 961, 57 L. Ed. 1507; Bonnett v. Vallier, 136 Wis. 193, 116 N. W. 885, 17 L. R. A. (N. S.) 486, 128 Am. St. Rep. 1061; State v. Crawford, 74 Wash. 248, 133 P. 590, 46 L. R. A. (N. S.) 1039. In Bon-

nett v. Vallier, the validity of a police regulation concerning the construction of tenement houses was involved.

The majority opinion seems to recognize that the ordinance in question is subject to condemnation because it undertakes to impose extreme and cumulative penalties before there has been a final determination of its validity, because it directs that the decree shall accord the appellees a reasonable time, after such decree is entered, to comply with the provisions of the ordinance, and shall perpetually enjoin the appellants from enforcing the penalty provisions of the ordinance until the expiration of such time. I seriously doubt the power of the court to so decree. The effect of such a decree would be to amend the terms of the ordinance, which provide that it shall be in force and effect from and after the date of its publication. In other words, the court, in effect, reads into the ordinance that which, in order to render it valid, the legislative body of the city should have written into the ordinance, but did not, namely, that the cumulative penalty provisions should not attach until after a final determination of the validity of the ordinance. I think we must either permit the city to enforce the ordinance as written, or we must hold the penalty section of the ordinance void, because of the severe and cumulative penalties which it imposes.

It is my opinion that the decree below was right, and should be affirmed.